451 F.2d 712
 UNITED STATES of America, Appellant,
v.
PACIFIC COAST EUROPEAN CONFERENCE, and its member lines, Appellees.
UNITED STATES of America, Appellant,
v.
PACIFIC COAST RIVER PLATE BRAZIL CONFERENCE, and its member
lines, Appellees.
UNITED STATES of America, Appellant,
v.
LATIN AMERICA/PACIFIC COAST S.S. CONFERENCE, and its member
lines, Appellees.
 Nos. 24248, 24250 and 24253.
 United States Court of Appeals,
Ninth Circuit.
 Oct. 22, 1971.
 
 Patricia S. Baptiste (argued), Alan S. Rosenthal, Norman Knoff, Dept. of Justice, William D. Ruckelshaus, Asst. Atty. Gen., Lawrence S. Ledebur, Chief, Adm. & Shipping Section, Washington, D. C., John F. Meadows, Atty., Admr. & Shipping Section, San Francisco, Cal., for appellant.
 F. Conger Fawcett (argued), of Graham & James, San Francisco, Cal., for appellees.
 Before BARNES, HAMLEY and CHOY, Circuit Judges.
 HAMLEY, Circuit Judge:
 
 
 1
 These are three civil actions, consolidated on appeal, brought by the United States to assess statutory penalties against three shipping conferences and their members for use of unlawful dualrate shipping contracts. The defendant conferences are Pacific Coast European Conference (Pacific Coast), Pacific Coast River Plate Brazil Conference (Brazil), and Latin America/Pacific Coast S.S. Conference (Latin-America). The district court granted summary judgment for each of the defendants. The United States appeals.
 
 
 2
 For half a century prior to May, 1958, individual international steamship rate-fixing conferences maintained agreements under which preferential rates were offered to shippers who agreed to patronize the conference exclusively. On May 19, 1958, in Federal Maritime Board v. Isbrandtsen Company, Inc., 356 U.S. 481, 78 S.Ct. 851, 2 L.Ed.2d 926 (1958), the Supreme Court held that the so-called system of dual rates involved in that case was illegal under section 14 of the Shipping Act, 1916, 39 Stat. 733, as amended 46 U.S.C. Sec. 812 Third (1958).
 
 
 3
 The Isbrandtsen decision cast serious doubt upon the validity of all dual-rate contracts. Responsive to this development, Congress promptly enacted interim legislation, terminating June 30, 1960, to permit the continued use of dual-rate contracts that were in use as of the date of the Isbrandtsen decision. Act of August 12, 1958, Pub.L. No. 85-626, 72 Stat. 574. In 1961, after three years of study, Congress amended the Shipping Act so as to authorize only the use of dual-rate contracts that met various stringent conditions and requirements. Dual-rate contracts that failed to satisfy the enumerated conditions and requirements were made unlawful and their use was made subject to civil monetary penalties.
 
 
 4
 Under section 1 of the Act of October 3, 1961 (1961 Act), now section 14b of the Shipping Act (46 U.S.C. Sec. 813a), it is provided that the Federal Maritime Commission (Commission) may not approve any dual-rate contract unless such contract expressly contains eight specified substantive requirements, and, under clause (9) of that section, "contains such other provisions not inconsistent herewith as the Commission shall require or permit." Section 1 also provides that any contract not permitted by the Commission
 
 
 5
 "* * * shall be unlawful, and contracts * * * shall be lawful only when and as long as permitted by the Commission; before permission is granted or after permission is withdrawn it shall be unlawful to carry out in whole or in part, directly or indirectly, any such contract * * *."
 
 
 6
 Section 3 of the 1961 Act, 75 Stat. 764, provided further interim relief pending action by the Commission.[1] Through an amendment to a separate section of the Shipping Act, 46 U.S.C. Sec. 814, Congress made the use of an unapproved dual-rate contract, in violation of the provisions of 46 U.S.C. Sec. 813a, outlined above, punishable by a civil penalty of up to one thousand dollars per day for each day of violation.
 
 
 7
 Within the six months' period prescribed by section 3 of the 1961 Act, the three defendant conferences and about sixth other shipping conferences submitted to the Commission for approval their proposed dual-rate contracts. The Commission, however, was unable to act on these applications prior to the expiration of the one-year grace period provided in section 3. Accordingly, the Commission asked Congress for, and obtained an extension of the one-year grace period specified in section 3, the new cut-off date being April 3, 1964. Act of April 3, 1963, Pub.L. No. 88-5, 77 Stat. 5.
 
 
 8
 On March 27, 1964, the Commission entered orders approving all of the dual-rate contracts "in the form" of a uniform contract attached to each order. The Commission also provided in these orders that, effective April 4, 1964, the uniform contract "shall be used by the [conferences] * * * to the exclusion of any other terms and provisions for the purpose of according merchants, shippers, and consignees contract rates."
 
 
 9
 The uniform dual-rate contract differed in substantial respects from the proposed contracts submitted for approval by the three defendant conferences. Thus, use of defendants' then-existing contracts after April 3, 1964, was contrary to section 14b of the Shipping Act, and contrary to the terms of the Commission orders of March 27, 1964. Nevertheless, the defendant conferences continued to utilize their existing and unapproved contracts while they prosecuted, in this court, their appeals from the Commission order.[2] The remaining sixty shipping conferences promptly accepted and utilized the Commission's uniform dual-rate contract form.
 
 
 10
 In defendants' review proceedings, this court rendered its decision on February 3, 1965, rehearing denied April 30, 1965. Pacific Coast European Conference v. United States, 350 F.2d 197 (9th Cir. 1965), hereinafter referred to as the Pacific case. In that decision we rejected defendants' arguments that the 1961 Act is invalid in several respects, and that the terms of the Commission orders of March 27, 1964 are contrary to the intent of that Act. However, we did uphold part of defendants' attack upon Commission procedures utilized in arriving at the orders of March 27, 1964, wherein defendants were not afforded an opportunity to participate in the rule making which led to the entry of those orders. We accordingly set aside the March 27, 1964 orders affecting defendants and remanded the causes to the Commission for further proceedings.
 
 
 11
 The paths of the three defendant conferences then began to diverge. Latin-America did not apply to the Supreme Court for certiorari, and waived its right to participate in the remanded agency proceedings. On August 6 and 17, 1965, Latin-America transmitted to its shippers and receivers, respectively, copies of its new dual-rate contracts complying with the Commission's March 27, 1964 order. The Commission has determined that Latin-America came into full compliance on September 14, 1965, but the record does not indicate how the agency arrived at this precise date.
 
 
 12
 Defendants Pacific Coast and Brazil petitioned the Supreme Court for writs of certiorari, after first petitioning the Commission for reconsideration of the Commission's order of June 24, 1965, on remand. On December 13, 1965, certiorari was denied. Pacific Coast European Conference v. United States, 382 U.S. 958, 86 S.Ct. 433, 15 L.Ed.2d 362 (1965). Defendant Brazil then wrote to the Commission reluctantly accepting the Commission's form of contract. The United States treats the date of this letter, December 27, 1965, as evidencing full compliance by Brazil.
 
 
 13
 Following denial of certiorari, defendant Pacific Coast did not immediately indicate compliance with the dual-rate order applicable to it. Instead, and while continuing to utilize its existing unapproved dual-rate contract, Pacific Coast participated in the remanded Commission proceedings. On February 16, 1966, the Commission issued an order in its Pacific Coast docket (No. 1007), reactivating that proceeding.
 
 
 14
 These further proceedings led the Commission, on September 22, 1966, to enter an order rejecting contentions which Pacific Coast had advanced, and allowing twenty days for comment on two contract clauses still in issue. Pacific Coast then advised the Commission that it did not object to the clauses then in question. Pacific Coast dual-rate contracts in full compliance with the Commission order of March 27, 1964, became effective January 1, 1967.
 
 
 15
 On April 4, 1967, the United States commenced these statutory penalty cases against the three defendants. Plaintiff seeks recovery of penalties from these defendants for the period from April 4, 1964, to December 31, 1966, in the case of Pacific Coast, to December 27, 1965, in the case of Brazil, and to September 14, 1965, in the case of Latin-America. Defendants' first motions for summary judgment were denied.
 
 
 16
 Defendants later filed renewed motions for summary judgment, and identical supporting memoranda. As shown by these supporting memoranda, defendants based their motions for summary relief on "* * * the constitutional principle, established by a long line of Supreme Court cases, that statutory penalties cannot lawfully attach during the period of a bona fide judicial review of a legislative act, whether statute or administrative agency ruling." The summary judgments for defendants do not state the grounds for such relief but we assume that they were granted upon the ground urged by defendants.
 
 
 17
 On this appeal the Government argues that the constitutional principle upon which defendants rely has no application under the circumstances of this case. Defendants, on the other hand, urge to the contrary, thus defining the primary issue before us.
 
 
 18
 In resolving this issue it is first necessary to understand the status of defendants' dual-rate contracts immediately preceding the 1961 enactment. While the Isbrandtsen decision cast doubt upon the validity of all dual-rate contracts, it actually only adjudicated the validity of the dual-rate contracts utilized by the Japan-Atlantic and Gulf Freight Conference. In determining that the Conference's dual-rate contracts were invalid, the Supreme Court held that, under the facts of that case, those contracts violated section 14 Third of the Shipping Act, 1916, as amended. But the Court made it plain that section 14 Third did not necessarily invalidate all dual-rate contracts. The Court said:
 
 
 19
 "Since, as we hold, Sec. 14 Third strikes down dual-rate systems only where they are employed as predatory devices, then precise findings by the Board as to a particular system's intent and effect would become essential to a judicial determination of the system's validity under the statute." (356 U.S., at 499, 78 S.Ct., at 862).[3]
 
 
 20
 Thus, prior to the 1961 enactment adding section 14b to the Shipping Act, there was no statute in effect categorically invalidating defendants' dual-rate contracts. Nor had there been, up to then, any judicial determination that defendants' dual-rate contracts were invalid. But, as noted above, the 1961 enactment expressly invalidated any such contracts unless they contained certain provisions and had received the approval of the Commission. It is therefore the 1961 enactment and the Commission order of March 27, 1964, thereunder, and nothing prior thereto, which specifically rendered defendants' dual-rate contracts invalid.
 
 
 21
 In the review proceeding which was before this court in the Pacific case, defendants directly challenged the validity of the 1961 Act. They contended that the entire 1961 Act deprived them of property without due process of law. They argued that the eight clauses of new section 14b, prescribing specific provisions which must be included in dual-rate contracts, are invalid, because the effect thereof is to deprive defendants of the right to utilize the assertedly reasonable provisions of their existing dual-rate contracts. They urged that the entire 1961 Act is void for vagueness and ambiguity, and because it places arbitrary restrictions upon private contracts without a legitimate purpose. Defendants also attacked individual parts of new section 14b as constituting standardless grants of legislative power, and as being vague, confusing, arbitrary and unreasonable.
 
 
 22
 The 1961 Act, considered as a whole, and its legislative history, discloses that Congress keyed invalidation of then-existing dual-rate contracts to the formulation of Commission-approved substitute dual-rate contracts which contained specified provisions, and others required by the Commission.
 
 
 23
 New section 14b of the Shipping Act of 1916, added by section 1 of the 1961 Act, provides that any contract not approved by the Commission shall be unlawful. That section further provides that the Commission shall permit the use of dual-rate contracts which contain the specified conditions and others required by the Commission, unless the Commission finds that the contract will be detrimental to the commerce of the United States, or contrary to the public interest, or unjustly discriminatory or unfair. Section 3 of the 1961 Act provides that all existing agreements which are rendered unlawful by the provisions of the Shipping Act must be amended to comply with the provisions of that Act, as amended by the 1961 Act.
 
 
 24
 In the way of legislative history we note first these significant circumstances: (1) upon the announcement of the decision in Isbrandtsen, Congress almost immediately granted blanket legalization of dual-rate contracts for a specified period without any standards. Act of August 12, 1958, Pub.L. No. 85-626, 72 Stat. 574; (2) Congress continued that entirely standardless authorization for a long period thereafter, on two separate occasions (Act of June 29, 1960, Pub.L. No. 86-542, 74 Stat. 253; Act of June 30, 1961, Pub.L. No. 87-75, 75 Stat. 195); (3) Congress continued the "open" authorization for a further eighteen-month period, even after enactment of the 1961 amendment of the Shipping Act, to permit an orderly adaptation to the new section 14b of the Act (Pub.L. No. 87-346, Sec. 3, 75 Stat. 764); and (4) when Commission approval was not forthcoming as of April, 1963, Congress gave a still further extension of the untested, blanket legality of dualrate contracts for an additional year (Act of April 3, 1963, Pub.L. No. 88-5, 77 Stat. 5).
 
 
 25
 These clear-cut indications that Congress intended to correlate its statutory prohibition of then-existing dual-rate contracts with a plan for substitute dual-rate contracts meeting statutory specifications and Commission approval are confirmed by the Senate and House reports on the 1961 legislation (see S. Rep. No. 860, 87th Cong., 1st Sess. 9 (1961); H.R.Rep. No. 498, 87th Cong., 1st Sess. 3, 12 (1961) U.S.Code Cong. & Admin.News, p. 3108), and by the Senate report on the 1963 statute which extended blanket legality for an additional year (see S.Rep. No. 79, 88th Cong., 1st Sess. (1963) U.S.Code Cong. & Admin.News, p. 620).
 
 
 26
 It follows, we think, that if any substantial part of the substitute dual-contract machinery set up in the 1961 Act were held to be invalid, the further provision in that Act invalidating existing dual-rate contracts and providing penalties for their future use would necessarily be undermined. Accordingly, when defendant conferences challenged the validity of major parts of the 1961 Act, they were also, in effect, challenging the provisions of that Act which invalidated existing dual-rate contracts.
 
 
 27
 Defendants' attack upon the validity of the 1961 Act was not frivolous; substantial questions were raised. We think this is true notwithstanding the fact that in the Pacific case, we upheld the validity of the 1961 Act.
 
 
 28
 In the light of the setting we have described we conclude that the constitutional tolling principle urged by defendants was correctly applied by the district court in granting summary judgment for defendants. Defendants ought not to have to pay a statutory penalty for non-compliance with the 1961 Act during the time they were judicially testing the validity of that Act, and enjoying the benefits of any additional agency procedures secured to them in that litigation.
 
 
 29
 While there are a number of Supreme Court decisions which tend to support this view,[4] we think Wadley Southern Railway Company v. Georgia, 235 U.S. 651, 35 S.Ct. 214, 59 L.Ed. 405 (1915), is closest in point. In Wadley the State of Georgia sought to collect a five-thousand-dollar statutory penalty from the railway because the latter had disobeyed an order of the Georgia Railroad Commission to desist from discriminating between shippers in the matter of demanding payment of freight in advance or on delivery. After upholding the validity of the Railroad Commission order and the state statute upon which it was based, the Supreme Court turned to the question of whether it was constitutionally permissible to assess a statutory penalty for noncompliance with a statute the validity of which had not yet been judicially determined.
 
 
 30
 The Supreme Court extensively reviewed prior decisions and stated:
 
 
 31
 "A statute therefore which imposes heavy penalties for violation of commands of an unascertained quality, is in its nature, somewhat akin to an ex post facto law since it punishes for an act done when the legality of the command had not been authoritatively determined. Liability to a penalty for violation of such orders, before their validity has been determined, would put the party affected in a position where he himself must at his own risk pass upon the question. He must either obey what may finally be held to be a void order, or disobey what may ultimately be held to be a lawful order. If a statute could constitutionally impose heavy penalties for violation of commands of such disputable and uncertain legality the result inevitably would be that the carrier would yield to void orders, rather than risk the enormous cumulative or confiscatory punishment that might be imposed if they should thereafter be declared to be valid." 235 U.S. at 662-663, 35 S.Ct. at 218.
 
 
 32
 In the present case, the Government contends that the constitutional rule stated in Wadley was not meant to apply in a situation where court review to test the validity of the statute and order is available to the party affected. This argument overlooks the fact that court review was available in Wadley itself, and that the Supreme Court nevertheless stated the rule to be applicable.
 
 
 33
 It is true that the Court upheld the penalty assessed in Wadley, but it did so because the carrier had made no effort to test the Railroad Commission order in the courts. The Court stated that if the railway had availed itself of its right to judicial review of the order, no penalty could be assessed, at least until the adjudication was complete. 235 U.S. at 669, 355 S.Ct. 214. In the case now before us, the defendants promptly and vigorously challenged the validity of the Commission order of March 27, 1964, and the 1961 statute on which it was based. We conclude, therefore, that this is the precise sort of case of which the Supreme Court spoke in Wadley.[5]
 
 
 34
 The Government's reliance on United States v. Morton Salt Company, 338 U.S. 632, 70 S.Ct. 357, 94 L.Ed. 401 (1950) is likewise misplaced. The defendants in that case, as in Wadley, failed to seek any judicial review to test the validity of the order, and the same distinctions we have just discussed apply.
 
 
 35
 The Government next argues that defendants had a substantial, adequate and safely-available right to judicial review of the 1961 Act and the Commission's dual-rate order, without risking a statutory penalty such as the Government here seeks. But that "riskless remedy" would be to either accept the Commission's dual-rate order, or forego any dual-rate contracts, while defendants pursued their judicial remedy. Apart from the fact that the first of these remedies would involve the possibility that mootness would defeat the review,[6] neither remedy comports with defendants' constitutional right of contract except where impaired by valid statute or administrative order.
 
 
 36
 It is of course true, as noted above, that in the Pacific case, this court determined that neither the 1961 Act, nor the Commission's March 27, 1964 dual-rate order, affected any constitutional, property, or other rights of defendants. But defendants' right to test the validity of the Act and Commission order free from the risk of statutory penalties must be judged, not by this court's after-the-fact determination, but by whether defendants mounted a substantial attack upon the validity of the statute and order. We hold that they did.
 
 
 37
 The Government also contends that the defendants had the additional alternative of obtaining a stay of the Commission's order, either from the Commission itself, or from this court by temporary injunction; and that since the defendants failed to apply to the Commission for a stay, and were refused an injunction in 1965, the tolling rule should not be applied. However, in almost the same breath, the Government explains to us that a stay of, or injunction against, the Commission order would have been totally ineffective to stop the statutory penalties from accruing. We can only conclude that the suggested alternative is illusory, and that the contention therefore lacks merit.
 
 
 38
 Finally, the Government argues that, even assuming the constitutional tolling principle referred to above is applicable here, the tolling terminated on February 3, 1965, when this court rendered its decision in the Pacific case. In our opinion, however, the tolling continued until defendants had obtained final disposition of that case by denial of certiorari in the Supreme Court, and thereafter, while one of the defendants, Pacific Coast, sought to participate in the remanded proceedings pursuant to our determination in the Pacific case. See Wadley, supra, 235 U.S. at 669, 35 S.Ct. 214, 59 L.Ed. 405. Unless this is true, the judicial review protected by the tolling doctrine would have been at least partially impaired, which is impermissible.
 
 
 39
 Affirmed.
 
 
 
 [1]
 "SEC. 3. Notwithstanding the provisions of sections 14, 14b, and 15, Shipping Act, 1916, as amended by this Act, all existing agreements which are lawful under the Shipping Act, 1916, immediately prior to enactment of this Act, shall remain lawful unless disapproved, canceled, or modified by the Commission pursuant to the provisions of the Shipping Act, 1916, as amended by this Act: Provided, however, That all such existing agreements which are rendered unlawful by the provisions of such Act as hereby amended must be amended to comply with the provisions of such Act as hereby amended, and if such amendments are filed for approval within six months after the enactment of this Act, such agreements so amended shall be lawful for a further period of not to exceed one year after such filing. Within such year the Commission shall approve, disapprove, cancel or modify all such agreements and amendments in accordance with the provisions of this Act."
 
 
 [2]
 At no time did defendant conferences, while using the unapproved contracts, apply to the Commission for a stay of the Commission's action, pending judicial review. They did apply to this court for preliminary injunctions to stay enforcement of the March 27, 1964 Commission orders pending appeal. By orders entered April 17, 1964, this court set argument on the injunction motions for April 27, 1964, and granted a 'temporary stay of the order or orders under review" until April 28, 1964. On April 28, 1964, this court entered orders denying the three applications for an interlocutory injunction, and the temporary stays thereupon terminated pursuant to their own terms
 
 
 [3]
 The Federal Maritime Board was the predecessor of the present Federal Maritime Commission
 
 
 [4]
 See, e. g., Oklahoma Operating Company v. Love, 252 U.S. 331, 40 S.Ct. 338, 64 L.Ed. 596 (1920); Missouri Pacific Ry. Co. v. Nebraska, 217 U.S. 196, 207-208, 30 S.Ct. 461, 54 L.Ed. 727 (1910); Ex Parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908)
 
 
 [5]
 See also, St. Regis Paper Co. v. United States, 368 U.S. 208, 225-227, 82 S.Ct. 289, 7 L.Ed.2d 240 (1961)
 
 
 [6]
 See Pacific Coast European Conference v. Federal Maritime Commission, 126 U.S. App.D.C. 230, 376 F.2d 785, 788, n. 4 (1967). Cf. Eastern Airlines, Inc. v. Civil Aeronautics Board, 341 U.S. 901, 71 S.Ct. 613, 95 L.Ed. 1341 (1951), dismissing as moot, 87 U.S.App.D.C. 331, 185 F.2d 426 (1950)