450 F.Supp. 805 (1978)
UNION ELECTRIC COMPANY, a Missouri Corporation, Plaintiff,
v.
ENVIRONMENTAL PROTECTION AGENCY, an agency of the United States of America, Defendant.
No. 78-164C(A).
United States District Court, E. D. Missouri, E. D.
March 16, 1978.
*806 William H. Ferrell, Schlafly, Griesedieck, Ferrell & Toft, St. Louis, Mo., for plaintiff.
Joseph B. Moore, Asst. U. S. Atty., St. Louis, Mo., for defendant.

MEMORANDUM OPINION AND ORDER
HARPER, District Judge.
The plaintiff, Union Electric Company (hereinafter referred to as UE), has filed a complaint seeking a declaratory judgment and a preliminary injunction and permanent injunction with respect to enforcement proceedings by Environmental Protection Agency (hereinafter referred to as EPA) with regard to emission standards for sulphur dioxide (hereinafter referred to as SO2) and opacity under the Clean Air Act, 42 U.S.C. § 7401 et seq. Plaintiff's prayer seeks equitable relief, a stay of any enforcement proceedings by EPA only so long as UE is actively and in good faith pursuing revisions and/or variance of the applicable regulations contained in the Missouri Implementation Plan before administrative agencies and/or courts of the State of Missouri. Plaintiff seeks no relief beyond the time at which its request for revisions are finally resolved by the administrative agencies and/or courts of the State of Missouri. Plaintiff does not ask the Court to determine the merits of its requests for revisions or the applicability of the Implementation Plan to its present operations.
*807 This matter is before the Court on plaintiff's motion for a preliminary injunction.
The jurisdiction of this Court exists pursuant to 28 U.S.C. § 1331(a) inasmuch as this is an action brought against EPA, an agency of the United States.
There is no dispute between the parties with respect to the facts presented. The pleadings, briefs of the parties, testimony and exhibits before the Court, and prior history, disclose that the plaintiff is an electric utility company serving the metropolitan St. Louis area and parts of Illinois and Iowa. Its three coal-fired generating plants, Labadie, Meramec and Sioux, are subject to the SO2 and opacity restrictions in the Missouri Implementation Plan as approved by EPA.
UE did not seek review of the Administrator's approval of the plan on May 31, 1972, 40 CFR 52.1320, within thirty days, as it was entitled to do under Section 307(b)(1) of the Act, 42 U.S.C. § 1857h-5(b)(1), but rather applied to the appropriate state and county agencies for variances from the emission limitations affecting its three plants. UE received a one-year variance for each of the plants which could be extended upon reapplication. The variances on two of the three plants had expired and plaintiff was applying for extensions when on May 31, 1974, the Administrator notified the plaintiff that SO2 emissions from its plants violated the emission limitations contained in the Missouri Implementation Plan.
On August 18, 1974, UE brought suit against the EPA in the United States Court of Appeals for the Eighth Circuit, contending that they should not have to comply with SO2 emission regulations because of economic reasons and because their SO2 emissions were not interfering with attainment or maintenance of the National Ambient Air Quality Standards (NAAQS) for SO2. Therein, UE contended that a claim or economic or technological infeasibility may be considered upon a petition for review of approval by the Administrator of a state implementation plan. In Union Electric Co. v. EPA, 515 F.2d 206 (8th Cir. 1975), the Court held that questions of economic and technological feasibility do not constitute grounds for review and that the court is without jurisdiction to consider the claim raised by UE in its petition for review. On October 6, 1975, the Supreme Court in UE v. EPA, 427 U.S. 246, 265-67, 96 S.Ct. 2518, 2529, 49 L.Ed.2d 474 (1976) held:
"In sum, we have concluded that claims of economic or technological infeasibility may not be considered by the Administrator in evaluating a state requirement that primary ambient air quality standards be met in the mandatory three years. And, since we further conclude that the States may submit implementation plans more stringent than federal law requires and that the Administrator must approve such plans if they meet the minimum requirements of § 110(a)(2), it follows that the language of § 110(a)(2)(B) provides no basis for the Administrator ever to reject a state implementation plan on the ground that it is economically or technologically infeasible. Accordingly, a court of appeals reviewing an approved plan under § 307(b)(1) cannot set it aside on those grounds, no matter when they are raised.
"Our conclusion is bolstered by recognition that the Amendments do allow claims of technological and economic infeasibility to be raised in situations where consideration of such claims will not substantially interfere with the primary congressional purpose of prompt attainment of the national air quality standards. Thus, we do not hold that claims of infeasibility are never of relevance in the formulation of an implementation plan or that sources unable to comply with emission limitations must inevitably be shut down.

"Perhaps the most important forum for consideration of claims of economic and technological infeasibility is before the state agency formulating the implementation plan. So long as the national standards are met, the State may select whatever mix of control devices it desires, Train v. NRDC, supra, 421 U.S. 60, at 79 [95 S.Ct. 1470, 43 L.Ed.2d 731,] and industries *808 with particular economic or technological problems may seek special treatment in the plan itself. Cf. 40 CFR §§ 51.2(b), (d) (1975); S. Rep. No. 91-1196, p. 36 (1970). Moreover, if the industry is not exempted from, or accommodated by, the original plan, it may obtain a variance, as petitioner did in this case; and the variance, if granted after notice and a hearing, may be submitted to the EPA as a revision of the plan.15 § 110(a)(3)(A), as amended, 88 Stat. 256, 42 U.S.C. § 1857c-5(a)(3)(A) (1970 ed., Supp. IV.) Lastly, an industry denied an exemption from the implementation plan, or denied a subsequent variance, may be able to take its claims of economic or technological infeasibility to the state courts. See, e.g., § 203.130, Mo.Rev.Stat. (1972); Cal. Health & Safety Code § 39506 (1973); Pa.Stat.Ann., Tit. 71, § 1710.41 (1962).16" (Emphasis added.)
In February, 1975, while the case of UE v. EPA was in the Eighth Circuit Court of Appeals, the U. S. Environmental Protection Agency filed a report titled "Implementation Plan Review as required by the Energy Supply and Environmental Coordination Act (Plff's Ex. 2). On page 4 of the report the EPA had this to say in part:
"The State Implementation Plan for Missouri has been reviewed for the most prevalent causes of over-restrictive fuel combustion emission limiting regulations. The major findings of the review are:
"* * * For sulfur dioxide, there are indications that emission limiting regulations for very large fuel burning sources may be overly-restrictive.
* * * * * *
"Missouri has direct fuel combustion regulations for SO2 only in the Metropolitan St. Louis Area. Except in St. Louis, therefore, fuel switching is not hindered by SO2 emissions regulations. Current air quality sampling data for St. Louis indicate high isolated SO2 concentrations in the Missouri portion of the metropolitan area. However, sources of SO2 other than power plants are in the immediate vicinity of these `hot spots'. Since these sources are presently meeting existing emission regulations, there are strong indications that regulations affecting these sources must be tightened."
The report continues on page 5:
"There are currently no indications that SO2 emissions from power plants in the Missouri portion of the St. Louis area are causing violations of SO2 air quality standards."
The Supreme Court handed down its decision in UE v. EPA on June 25, 1976. UE filed a motion for rehearing. On July 22, 1976, following the Supreme Court's decision, Jerome H. Svore, Regional Administrator for EPA, wrote a letter to the Chairman of the Missouri Air Quality Commission (Plff's Ex. 3), which stated in part as follows:
"The EPA has reviewed the SO2 monitoring data for the area around three UECO plants and performed some diffusion modeling calculations. The results of this review and these calculations indicates that UECO was correct in the contention that its SO2 emissions were not interfering with the attainment or maintenance of the NAAQS for SO2.
"The EPA sent a letter to Governor Christopher S. Bond on March 28, 1975, a copy of which you have, transmitting a copy of a report entitled `Implementation Plan Review for Missouri as Required by the Energy Supply and Environmental Coordination Acts.' This report stated that the State of Missouri could relax the SO2 emission standard which applies to the three UECO plants mentioned previously, without violating the ambient air quality standards.
"The EPA has no objections to your amending Regulation X to relax the SO2 emission standard for the three UECO plants which were mentioned previously. The new SO2 emission standard must still provide for attainment and maintenance of the NAAQS and this must be demonstrated by a revision to the Control Strategy Section of the Missouri State Implementation Plan.

*809 "If you decide not to follow the above course of action or place the UECO on a compliance schedule to comply with Regulation X, the EPA has no alternative but to issue an Administrative Order, pursuant to Section 113 of the Clean Air Act, which requires the UECO to comply with the SO2 emission standard specified by Regulation X. This enforcement action is necessary because the EPA cannot allow an emission source to violate an emission standard in a federally approved SIP unless there is an approved expeditious compliance schedule.
"Because of the seriousness and magnitude of this problem, it is imperative for the Missouri Air Conservation Commission (MACC) and the EPA to be on the same wave length. I will be looking forward to hearing from you on any decisions the MACC may make. If we can help, let me know."
In September, 1976, after receipt of the Supreme Court decision, but before the motion for rehearing was overruled on October 4, 1976, UE filed a petition with the Missouri Air Conservation Commission for a relaxation of the existing regulations for SO2 or in the alternative for a variance from the existing regulations for the individual UE plants. UE secured expert witnesses and prepared to submit evidence to support the petition.
The Missouri Air Conservation Commission in April, 1977, tabled the request of UE to change the SO2 emission limitation (testimony of witness Smith), or voted not to change the SO2 emission limitations for the St. Louis metropolitan area (Plff's Ex. 4), but indicated it would consider the Company's petition for a variance for the Sioux and Labadie plants. A Mr. Sanderson, a representative of the EPA, was present and indicated such would be agreeable.
There was a later meeting attended by representatives of the Commission, EPA and UE with respect to the problem, in which it was stated a variance would be granted. Plaintiff's Exhibit 6, a copy of a letter written by Charles V. Wright, Acting Regional Administrator, sent to James P. Odendahl, P.E., Acting Director of the Division of Environmental Quality, dated May 31, 1977, subsequent to the above occurrence states in part:
"I am pleased to respond to Mr. Michael T. Marshall's letter of May 28, 1977, regarding the Commission's intent to grant a variance to Union Electric (UE) for the operation of their Portage Des Sioux and Labadie power plants. You requested information on the requirements regarding the approvability of a variance by the Environmental Protection Agency (EPA) as a revision to the State Implementation Plan (SIP)."
The letter sets out various information with respect to the applicable statutory and regulatory requirements. In the first paragraph on page 3 of the letter, it is stated as follows:
"Since the Commission has now voted not to change the SO2 emission limitations in the St. Louis regulations, I will expect the State to act promptly to bring the UE plants into compliance with the existing limitations or to adopt and justify less stringent limitations in accordance with Federal requirements."
UE has complied with the SO2 requirements at the Meramec plant by burning low sulphur coal, but in doing so has reduced the efficiency of existing particulate controls and gone out of compliance with the state and county particulate and visible emission regulations.
On November 11, 1977, Kathleen Q. Camin, Regional Administrator of EPA, wrote a letter to James P. Odendahl, Director of the Division of Environmental Quality (Plff's Ex. 4). The letter in part states:
"As you know, Union Electric petitioned the Missouri Air Conservation Commission in the fall of 1976 for a relaxation of the existing regulation for SO2 or, in the alternative, for a variance from the existing regulation for the individual Union Electric plants. The Commission voted not to change the SO2 emission limitations for the St. Louis metropolitan area, but indicated they would consider the company's petition for a variance for the Sioux and Labadie plants."

*810 "In a letter to you dated May 31, 1977, Mr. Charles V. Wright, Acting Regional Administrator, stated that since the Commission had voted not to change the SO2 emission limitation in the St. Louis regulation, the State was expected to act promptly to either bring the Union Electric plants into compliance with the existing limitation or to adopt and justify less stringent limitations in accordance with Federal requirements. Five months have passed and the State has yet to take any action with regard to the Labadie and Sioux power plants."
During all of this period the UE stood ready to present testimony to support its petition for relaxation of existing regulations or for variance, but the Commission has not acted upon the petition.
Thereafter, the Missouri Commission set a hearing for February 13, 1978, on said application, and then over the objection of UE reset the hearing for March 6, 1978.
On January 13, 1978, after the hearing before the Missouri State Commission had been set, EPA sent notices of violation to UE (Plff's Ex. 1). In the notice, the EPA charged the UE Labadie and Sioux power plants with violation of SO2 and opacity regulations, and also charged the Meramec plant with violation of opacity regulations. 10 CSR 10-5.110(2) and 10 CSR 10-5.090. These regulations are contained in the Missouri Implementation Plan as approved by the EPA. The notice further pointed out certain penalties and injunctions shall be invoked thirty days after notification of violation. Indeed, § 113(b) of the Clean Air Act, as revised by the 1977 amendments, now provides that whenever any person violates a requirement of an applicable implementation plan for more than thirty days after having been notified of the violation, the Administrator shall, in the case of a major stationary source commence a civil action for a permanent or temporary injunction or to assess and recover a civil penalty of $25,000 per day of violation. 42 U.S.C. § 7413(b)(2)(B). Additionally, any person who knowingly violates any requirement of an applicable implementation plan more than thirty days after having been notified of its violation by the Administrator is subject to criminal action involving a penalty of $25,000 per day of violation, or by imprisonment of not more than one year or both. Such a criminal action may be brought against both the company and its "responsible officers." 42 U.S.C. § 7413(c)(3), 42 U.S.C. § 7413(C)(1)(A)(ii). Each of UE's power plants involved herein are major stationary sources as defined in § 302(j) of the Act, 42 U.S.C. § 7602(j).
Thus, the plaintiff is presently in an unenviable position in which daily penalties for noncompliance with the state implementation plan are accruing while it seeks variances pursuant to the statutorily authorized procedure contained in V.A.M.S. § 203.110. Additionally, Union Electric's first mortgage and deed of trust (Plff's Ex. 7), under which $1,078,000,500 principal amount of its bonds are outstanding, provide that the failure of Union Electric to comply with any governmental directives could constitute an act of default and make all such bonds callable. A calling of all bonds could force the plaintiff into bankruptcy.
Immediate compliance with the applicable regulations is not possible. The testimony before the Court indicated that the only way compliance with the SO2 regulation could be achieved at those plants would be by the installation of flue gas desulphurization (FGD) equipment or by the use of low sulphur coal. The installation of FGD equipment on those plants would require a capital expenditure over the next four to five years of over $713,000,000 and annual operating costs of $137,000,000 as of the assumed 1983 start-up year. Such equipment would not produce any electricity. The construction of such equipment would require at least five years at Union Electric's plants. Additionally, testimony indicated that FGD equipment cannot be relied on, even with the best of maintenance, to operate continually or satisfactorily. As stated by Justice Powell, UE v. EPA, supra, 427 U.S. at 271 n. 2, 96 S.Ct. at 2532, "[T]he burden of these extraordinary capital and operating costs, even if the technological *811 infeasibility problems could be solved, would fall necessarily on the consumers of electric power."
The annual cost of low sulphur coal over that now being used at the Labadie and Sioux plants would be almost $179,000,000 plus capital investment of $49,000,000. This would cause a rate increase of approximately twenty-five percent if there were no decrease in the use of electricity. Further, testimony indicated that it is presently impossible to obtain a sufficient supply of low sulphur coal to meet the SO2 emission regulation.
Compliance could be achieved only by a shutdown of its plants. The Labadie and Sioux plants alone constitute more than fifty percent of the base generating capacity of the plaintiff. A shutdown of these plants could result in a widespread electrical breakdown throughout the Midwest and would result in drastic financial consequences to the plaintiff. Justice Powell in UE v. EPA, supra at 272, 96 S.Ct. at 2532, said:
"[T]he shutdown of an urban area's electrical service could have an even more serious impact on the health of the public than that created by a decline in ambient air quality. The result apparently required by the legislation [Clean Air Act] in its present form could sacrifice the well-being of a large metropolitan area through the imposition of inflexible demands that may be technologically impossible to meet and indeed may no longer even be necessary to the attainment of the goal of clean air.
"I believe that Congress, if fully aware of this draconian possibility, would strike a different balance."
Further, it is conceivable that a voluntary shutdown by the plaintiff would violate its statutory duty to provide such service facilities as shall be safe and adequate, and in all respects just and reasonable. V.A.M.S. § 393.130.1. The Missouri Public Service Commission has held that a public utility may not abandon service except for sound and equitable reasons after a fair and reasonable trial at operation. 6 Mo.P.S.C. 681.
At the outset it is important to note that the general function of a preliminary injunction is to maintain the status quo pending determination of the action on its merits. Blaylock v. Cheker Oil Co., 547 F.2d 962, 965 (6th Cir. 1976). The traditional requirements necessary for the grant of a temporary injunction are: (1) Irreparable harm to the petitioner unless preliminary relief is granted; (2) absence of substantial harm to the opposing party; (3) absence of harm to the public interest; and (4) a likelihood that the petitioner will prevail on the merits of his case. See Doran v. Salem Inn, Inc., 422 U.S. 922, 931, 95 S.Ct. 2561, 45 L.Ed.2d 648 (1975); Mo. Portland Cement Co. v. H. K. Porter Co., 535 F.2d 388, 392 (8th Cir. 1976); Washington v. Walker, 529 F.2d 1062, 1065 (7th Cir. 1976); A. O. Smith Corp. v. FTC, 530 F.2d 515, 525 (3rd Cir. 1976); Canal Authority v. Callaway, 489 F.2d 567, 572 (5th Cir. 1974). These requirements have undisputably been met in the present case.
Plaintiff has established irreparable harm through the potential calling of its bonds, which could force plaintiff into bankruptcy, and the threatened enforcement of daily accumulating criminal and civil penalties, including an injunction not to violate the regulation which could only be accomplished by closing the plant, under 42 U.S.C. § 7413(b) and (c). Abbott Laboratories v. Gardner, 387 U.S. 136, 152-56, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967); Hynes v. Grimes Packing Co., 337 U.S. 86, 99-100, 69 S.Ct. 968, 93 L.Ed. 1231 (1949).
The injury to the defendant is not substantial, and is certainly outweighed by the injury to the plaintiff. Indeed, as previously referred to, Jerome H. Svore, the Regional Administrator for the EPA, in a letter (Plff's Ex. 3) to the Chairman of the Missouri Air Quality Commission, conceded that the UE's Sioux and Labadie plants do not violate NAAQS for SO2 and that the EPA would be amenable to a revision of state standards by the Missouri Air Conservation Commission. The plaintiff is in violation of the implementation plan only because *812 Missouri standards exceed those necessary for compliance with the National Standards (NAAQS), as the states are free to adopt stricter standards than the national standards under § 116 of the Clean Air Act, 42 U.S.C. § 1857d-1 (1970 Ed. Supp. IV). See also UE v. EPA, supra, 427 U.S. at 261-66, 96 S.Ct. 2518.
The public interest is manifestly in favor of continued operation by the plaintiff. UE v. EPA, supra at 272, 96 S.Ct. 2518 (Powell concurring).
In American Home Products Corp. v. Finch, 303 F.Supp. 448, 456 (D.Del.1969), it was held that a substantial likelihood of success need not be demonstrated where:
"The question is not of court interference with `ordinary processes of administration' pending judicial review, but rather one of insuring the functioning of the `ordinary processes of administration' necessary to protect the procedural rights of the plaintiff and prevent irreparable injury to him. Further, in contrast to a determination of probable success on appeal, this Court does not possess the necessary expertise to determine, in advance of a hearing before the appropriate administrative body, whether the plaintiff will have a `substantial likelihood of success' before that body."
In the present case, the petitioner does not request this Court to determine the merits of its request for a variance. Rather, it seeks only a maintenance of the status quo while pursuing administrative and/or judicial procedures, to which it is statutorily authorized under V.A.M.S. § 203.110 et seq. The decision in American Home Products, supra, would thus be applicable, however this Court is not compelled to rely upon it. The magnitude of the injury posed to the public and the petitioner, the absence of any violation of national standards, and the previous grants of variances by the Missouri Air Conservation Commission indicate a substantial likelihood of success here. The Court doubts that the Commission would require the shutdown of a regional power company, with the subsequent devastating effects on this area to achieve air quality standards that have specifically been determined unnecessary by EPA.
The plaintiff principally argues that it is entitled to a stay of enforcement proceedings while it is pursuing in good faith state procedures for a change in regulations or a variance as a matter of procedural process, citing Ex Parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). Therein the Supreme Court held that state statutes establishing maximum rail rates and providing for daily accumulating penalties, including imprisonment for violation thereof, were constitutionally invalid, since the parties had been given no opportunity to contest the validity of the rates, and were effectively denied judicial review of the rates by the magnitude of the penalties.
"Now to impose upon a party interested in the burden of obtaining a judicial decision of such a question (no prior hearing having ever been given) only upon the condition that, if unsuccessful, he must suffer imprisonment and pay fines, as provided in these acts, is, in effect, to close up all approaches to the courts, and thus prevent any hearing upon the question whether the rates as provided by the acts are not too low, and therefore invalid. The distinction is obvious between a case where the validity of the act depends upon the existence of a fact which can be determined only after investigation of a very complicated and technical character, and the ordinary case of a statute upon a subject requiring no such investigation, and over which the jurisdiction of the legislature is complete in any event."
Ex Parte Young, supra at 148, 28 S.Ct. at 449. Accord. Wadley Southern Ry. v. Georgia, 235 U.S. 651, 669, 35 S.Ct. 214, 59 L.Ed. 405 (1915).
In St. Regis Paper Co. v. United States, 368 U.S. 208, 82 S.Ct. 289, 7 L.Ed.2d 240 (1961), the Supreme Court held that daily accumulating penalties for failure to file special reports in compliance with FTC orders were not invalid where "petitioner did not try to obtain judicial review prior to the commencement" of the government's enforcement action, and where the petitioner *813 did not "seek a stay once the litigation had begun." St. Regis Paper Co. v. United States, supra, at 225, 82 S.Ct. at 299. See also United States v. Morton Salt Co., 338 U.S. 632, 654, 70 S.Ct. 357, 94 L.Ed. 401 (1950); United States v. Pacific Coast European Conference, 451 F.2d 712 (9th Cir. 1971); Genuine Parts Co. v. F. T. C., 445 F.2d 1382 (5th Cir. 1971). This line of cases holds that a party whose conduct is made subject to administrative action must be given an opportunity to obtain a judicial test of the validity of such action and, as a matter of due process of law, cannot be subjected to the risk that substantial penalties will accumulate during the course of the judicial proceeding.
The plaintiff is presently pursuing the only method by which it can achieve compliance with state standards without violating its statutory duty to provide service. V.A.M.S. § 393.130.1. Persons seeking to relax state emission standards more stringent than those required by the National Standards must obtain their relief from the state. UE v. EPA, supra, at 263 n. 10, 265 n. 14, 96 S.Ct. 2518.
Due process requires a full and fair hearing before an impartial tribunal "at a meaningful time and in a meaningful manner." Armstrong v. Manzo, 380 U.S. 545, 552, 85 S.Ct. 1187, 1191, 14 L.Ed.2d 62 (1965). See also Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970). A hearing which comports with due process requirements must ordinarily be accorded before a party "can be condemned to suffer a grievous loss." Joint Anti-Fascist Refugee Comm. v. McGrath, 341 U.S. 123, 168, 71 S.Ct. 624, 647, 95 L.Ed. 817 (1951) (Frankfurter concurring). The Court concedes that there is little precedent in the environmental area for its decision herein due to the relative newness of the Clean Air Act. However, the enforcement of certain orders by the Food and Drug Administration have been temporarily stayed, upon considerations of procedural due process, until a hearing before that agency on the merits of the case, where the petitioner presented reasonable grounds for objecting to the order and also established the traditional requirements for a temporary injunction. American Home Products Corp. v. Finch, 303 F.Supp. 448 (D.Del.1969). See also Upjohn Co. v. Finch, 303 F.Supp. 241 (W.D.Mich.1969). This Court concludes that as a matter of procedural due process, as guaranteed by the 5th Amendment, the plaintiff is entitled to seek a variance under state proceedings prior to the institution of enforcement proceedings.
The Clean Air Act, 42 U.S.C. § 7401 et seq. (1977 amendments) has delegated a considerable amount of responsibility to the states for achieving its purposes and goals. See Luneburg, Federal-State Interaction Under the Clean Air Amendments of 1970, 14 B.C.Ind. & Com.L.Rev. (1973). The 1970 amendments reflect congressional dissatisfaction with the progress of existing air pollution programs and a determination to "take a stick to the States." Train v. Natural Resources Defense Council, 421 U.S. 60, 64, 95 S.Ct. 1470, 1474, 43 L.Ed.2d 731 (1975). The states are required to formulate, subject to EPA approval, an implementation plan designed to achieve national ambient air quality standards. 42 U.S.C. § 7410(a)(1). The states are further permitted to go beyond national standards by enacting more strict state standards. UE v. EPA, supra at 261-65, 96 S.Ct. 2518. The states may also enact a procedure to revise its plan. 42 U.S.C. §§ 7410(a)(3)(A), 7410(a)(5)(A)(iii). A variance approved as a revision of a plan under § 110(a)(3)(A) of the Act, 42 U.S.C. § 7410(a)(3)(A) must be honored by the EPA as part of the applicable implementation plan. UE v. EPA, supra at 266 n. 15, 96 S.Ct. 2518. It would be incongruous to permit the EPA to pursue enforcement while a variance is being sought as to a state standard, especially in light of the magnitudinous irreparable harm posed to the plaintiff as heretofore discussed. Assuming that a variance is granted, the EPA will find itself enforcing or having enforced a regulation that is no longer in effect.
Indeed, it has been interpreted that an application for a variance under the provisions *814 of V.A.M.S. § 203.110 stays enforcement of the regulation at issue as to the person filing the petition. Op. (Mo.) Atty. Gen.No. 281, Shell, 4-14-70. It should also be noted that the members of the Missouri Air Conservation Commission are statutorily required to be "persons experienced in the field of air pollution," and hence the commission may constitute a more knowledgeable forum than any court of law. V.A.M.S. § 203.040.1.
The cases cited by the defendant are in-apposite. The EPA relies upon Lloyd A. Fry Roofing Co. v. EPA, 554 F.2d 885 (8th Cir. 1977). Therein, the plaintiff sought pre-enforcement review of the EPA's Notice of Violation and Compliance Order, challenging their validity and merits. Here, no compliance order has been issued and plaintiff seeks only a stay of enforcement proceedings until it has exhausted its request for a variance, which can only be obtained under state law. UE v. EPA, supra. This same consideration is applicable to West Penn Power Co. v. Train, 522 F.2d 302 (3rd Cir. 1975). The Court in Fry was particularly concerned that "[p]re-enforcement review would severely limit the effectiveness of the conference procedure as a means to abate violations of the Act without resort to judicial process." Lloyd A. Fry Roofing Co. v. EPA, supra at 891. The 1977 amendments to the Clean Air Act effectively dispose of the consideration by requiring the commencement of a civil action against any operator of a major stationary source for violations occurring thirty days after notification by the Administrator. 42 U.S.C. § 7413(b)(2)(B). The Court of Appeals also stated, l.c. 891:
"[W]e are persuaded by the legislative history of the Clean Air Act amendments of 1970 to hold that plaintiff lacks authority to initiate and maintain litigation to challenge the EPA's order issued on March 9, 1976, and that plaintiff must assert its claims as a defense or counterclaim in any action brought by the Administrator of EPA under section 113 of the Clean Air Act. 42 U.S.C. § 1857c-8."
However, the Supreme Court in UE v. EPA, supra at 266-7, 96 S.Ct. 2518, clearly established that claims of economic and technological infeasibility may be raised in state proceedings.
The defendant also places considerable reliance upon a statement contained in Train v. NRDC, 421 U.S. 60, 92, 95 S.Ct. 1470, 1488, 43 L.Ed.2d 731 (1975). Therein, the Court stated:
"As made clear in the Getty case [Getty Oil Co. v. Ruckelshaus, 342 F.Supp. 1006 (D.Del.), remanded with directions, 467 F.2d 349 (3rd Cir. 1972)] * * * a polluter is subject to existing requirements until such time as he obtains a variance, and variances are not available under the revision authority until they have been approved by both the State and the Agency. Should either entity determine that granting the variance would prevent attainment or maintenance of national air standards, the polluter is presumably within his rights in seeking judicial review. This litigation, however, is carried out on the polluter's time, not the public's, for during its pendency the original regulations remain in effect, and the polluter's failure to comply may subject him to a variety of enforcement procedures."
Initially, it should be noted that the Getty case has overruled in UE v. EPA, supra at 254, 96 S.Ct. 2518. Secondly, this Court deems it unlikely that the statement made above was intended to preclude the exercise of this Court's equitable powers in the face of extraordinary irreparable harm, without an express intent to that effect. Third, the plaintiff herein seeks only a stay of enforcement proceedings by the EPA until pending state processes are exhausted.
In conclusion this Court holds:
(1) That considerations of procedural due process require that the plaintiff be permitted to seek a variance under state procedures prior to suffering a grievous loss which may result from an enforcement proceeding by the EPA;
*815 (2) That this Court under its general equitable powers has the authority to stay an enforcement proceeding to prevent irreparable harm while the plaintiff seeks in good faith a variance under State procedures; and
(3) That the only fair interpretation of the Clean Air Act, where an enforcement proceeding may be instituted while the polluter is seeking a variance of the state implementation plan, is to allow the variance proceeding to go first with any enforcement action to follow.
Accordingly, pending final determination of this litigation, but in no event beyond the final determination of the plaintiff's pending request for a revision variance of the applicable Missouri Implementation Plan, the defendant, Environmental Protection Agency, and its officers and employees, are hereby enjoined from instituting any enforcement proceedings against the plaintiff, Union Electric, and/or its responsible officers while Union Electric is actively and in good faith pursuing a revision or variance of the sulphur dioxide regulations of the Missouri Implementation Plan in the administrative agencies and/or courts of the State of Missouri pursuant to V.A.M.S. §§ 203.110 and 203.130.
This preliminary injunction is granted on the condition that plaintiff post within three (3) days a bond in the amount of $500,000.00 for the payment of such costs and damages as may be incurred or suffered by the defendant if it is found to have been wrongfully enjoined or restrained.