**UNION ELECTRIC COMPANY,**
**Appellee,**

v.

**ENVIRONMENTAL PROTECTION**
**AGENCY, Appellant.**

**No. 78–1357.**

United States Court of Appeals,
Eighth Circuit.

Submitted Nov. 16, 1978.

Decided Feb. 20, 1979.

Rehearing and Rehearing En Banc
Denied March 15, 1979.

William H. Ferrell of Schlafly, Griesedieck, Ferrell & Toft, St. Louis, Mo., for appellee; James J. Virtel, Jerry B. Wamser, St. Louis, Mo., on the brief.

Martin Green, Atty., Dept. of Justice, Washington, D. C., for appellant; Sanford Sagalkin, Deputy Asst. Atty. Gen., Washington, D. C., Robert D. Kingsland, U. S. Atty., Joseph B. Moore, Asst. U. S. Atty.,

St. Louis, Mo., George R. Hyde, Barbara Brandon, Attys. Dept. of Justice, Washington, D. C., on the brief; Joan Z. Bernstein, Gen. Counsel, Ronald C. Hausmann, Atty., Environmental Protection Agency, Washington, D. C., of counsel.

Before LAY and HEANEY, Circuit Judges, and HANSON,* Senior District Judge.

HEANEY, Circuit Judge.

The Environmental Protection Agency appeals from a judgment of the United States District Court for the Eastern District of Missouri which enjoined the EPA from instituting an enforcement proceeding under the Clean Air Act, 42 U.S.C. § 7401 *et seq,* against the Union Electric Company or its officers while that Company is actively and in good faith pursuing a revision or variance of the sulfur dioxide ($SO_2$ regulations of the Missouri Implementation Plan in the administrative agencies and/or courts of the State of Missouri. We reverse the judgment of the District Court and direct that the complaint of Union Electric be dismissed.

Union Electric serves the metropolitan St. Louis area and parts of Illinois and Iowa. Its three coal-fired generating plants, Labadie, Meramec and Sioux, are subject to the $SO_2$ and opacity restrictions in the Missouri Implementation Plan as approved by the EPA on May 31, 1972.

Union Electric did not seek review of the approved Missouri Implementation Plan within thirty days as it was entitled to do under § 307(b)(1) of the Act, 42 U.S.C. § 1857h–5(b)(1).[1] It did, however, obtain one-year variances from the appropriate state and county agencies which eased the emission limitations affecting its three plants. The variances for two of the three plants had expired and Union Electric was applying for extensions when, on May 31, 1974, the Administrator of the EPA notified the Company that the $SO_2$ emissions from its plants violated the emission limitations contained in the Missouri Implementation Plan, and advised it of the probability that enforcement proceedings would soon be instituted.

On August 18, 1974, Union Electric sought review in this Court, contending that the $SO_2$ emission regulations contained in the Missouri Implementation Plan were economically and technologically infeasible and that its emissions were not interfering with attainment or maintenance of the National Ambient Air Quality Standards (NAAQS). We held that the claims of infeasibility did not afford a basis for review under § 307(b)(1) of the Act, 42 U.S.C. § 1857h–5(b)(1), and dismissed Union Electric's petition for lack of jurisdiction. *Union Electric Co. v. Environmental Pro. Agcy.,* 515 F.2d 206 (8th Cir. 1975).

Our decision was affirmed by the Supreme Court on October 6, 1975. *Union Electric Co. v. EPA,* 427 U.S. 246, 96 S.Ct. 2518, 49 L.Ed.2d 474 (1976). In that opinion, the Supreme Court stated:

[C]laims of economic or technological infeasibility may not be considered by the Administrator in evaluating a state requirement that primary ambient air quality standards be met in the mandatory three years. * * * [T]he States may submit implementation plans more stringent than federal law requires and * * * the Administrator must approve such plans if they meet the minimum requirements of § 110(a)(2), * * * [thus] the language of § 110(a)(2)(B) provides no basis for the Administrator ever to reject a state implementation plan on the ground that it is economically or technologically infeasible. Accordingly, a court

---

* WILLIAM C. HANSON, United States Senior District Judge for the Southern District of Iowa, sitting by designation.

1.  Section 307(b)(1) was revised by the Clean Air Act Amendments of 1977, Pub.L. No. 95–95, 91 Stat. 685 (1977), and the new version of this section now appears at 42 U.S.C. § 7607.

We note that in *Union Electric Co. v. EPA,* 427 U.S. 246, 96 S.Ct. 2518, 49 L.Ed.2d 474 (1976), the Supreme Court held that questions of economic or technological infeasibility cannot be raised in proceedings under this section. *Id.* at 265–266, 96 S.Ct. 2518.

of appeals reviewing an approved plan under § 307(b)(1) cannot set it aside on those grounds, no matter when they are raised.

Our conclusion is bolstered by recognition that the Amendments do allow claims of technological and economic infeasibility to be raised in situations where consideration of such claims will not substantially interfere with the primary congressional purpose of prompt attainment of the national air quality standards. Thus, we do not hold that claims of infeasibility are never of relevance in the formulation of an implementation plan or that sources unable to comply with emission limitations must inevitably be shut down.

Perhaps the most important forum for consideration of claims of economic and technological infeasibility is before the state agency formulating the implementation plan. So long as the national standards are met, the State may select whatever mix of control devices it desires, * * * and industries with particular economic or technological problems may seek special treatment in the plan itself. * * * Moreover, if the industry is not exempted from, or accommodated by, the original plan, it may obtain a variance, as petitioner did in this case; and the variance, if granted after notice and a hearing, may be submitted to the EPA as a revision of the plan. § 110(a)(3)(A), as amended, 88 Stat. 256, 42 U.S.C. § 1857c–5(a)(3)(A) (1970 ed., Supp. IV.) Lastly, an industry denied an exemption from the implementation plan, or denied a subsequent variance, may be able to take its claims of economic or technological infeasibility to the state courts. See, e. g., § 203.130, Mo[.] Rev[.] Stat[.] (1972); Cal[.] Health & Safety Code § 39506 (1973); Pa[.] Stat[.] Ann[.], Tit. 71, § 1710.41 (1962). (Citations and footnotes omitted, and emphasis added.)

*Id.* at 265–267, 96 S.Ct. at 2529–30.

Union Electric petitioned the Supreme Court for a rehearing, which was subsequently denied. The Regional Administrator for EPA wrote a letter to the chairman of the Missouri Air Quality Commission, which stated in part:

The EPA has reviewed the $SO_2$ monitoring data for the area around three UECO plants and performed some diffusion modeling calculations. The results of this review and these calculations indicates [sic] that UECO was correct in the contention that its $SO_2$ emissions were not interfering with the attainment or maintenance of the NAAQS for $SO_2$.

\* \* \* \* \* \*

The EPA has no objections to your amending Regulation X to relax the $SO_2$ emission standard for the three UECO plants which were mentioned previously. The new $SO_2$ emission standard must still provide for attainment and maintenance of the NAAQS and this must be demonstrated by a revision to the Control Strategy Section of the Missouri State Implementation Plan.

If you decide not to follow the above course of action or place the UECO on a compliance schedule to comply with Regulation X, the EPA has no alternative but to issue an Administrative Order, pursuant to Section 113 of the Clean Air Act, which requires the UECO to comply with the $SO_2$ emission standard specified by Regulation X. This enforcement action is necessary because the EPA cannot allow an emission source to violate an emission standard in a federally approved SIP [State Implementation Plan] unless there is an approved expeditious compliance schedule.

Because of the seriousness and magnitude of this problem, it is imperative for the Missouri Air Conservation Commission (MACC) and the EPA to be on the same wave length. I will be looking forward to hearing from you on any decisions the MACC may make. If we can help, let me know.

In September, 1976, Union Electric filed a petition with the Missouri Air Conservation Commission for a relaxation of the existing regulations for $SO_2$, or, in the alternative, for a variance from existing regulations for

the Company's plants. In April, 1977, the Commission tabled the Company's request to change the existing $SO_2$ emission limitations and denied the Company's request for a variance for its St. Louis plant. The Commission indicated, however, that it would consider the Company's petition for variances for the Sioux and Labadie plants. A representative of the EPA was present and indicated agreement with that procedure.[2] Variance petitions for the Sioux and Labadie plants were filed by the Company in September, 1977.

On November 11, 1977, the Regional Administrator of the EPA wrote a letter to the Director of the Missouri Division of Environmental Quality which stated, in pertinent part:

Based on inspections conducted by the Environmental Protection Agency in the Fall of 1976, the Portage Des Sioux and Labadie power plants are both in violation of the $SO_2$ emission limitation in the approved Missouri Implementation Plan. As you know, Union Electric petitioned the Missouri Air Conservation Commission in the Fall of 1976 for a relaxation of the existing regulation for $SO_2$ or, in the alternative, for a variance from the existing regulation for the individual Union Electric plants. The Commission voted not to change the $SO_2$ emission limitations for the St. Louis metropolitan area, but indicated they would consider the company's petition for a variance for the Sioux and Labadie plants.

In a letter to you dated May 31, 1977, Mr. Charles V. Wright, Acting Regional Administrator, stated that since the Commission had voted not to change the $SO_2$ emission limitation in the St. Louis regulation, the State was expected to act promptly to either bring the Union Electric plants into compliance with the existing limitation or to adopt and justify less stringent limitations in accordance with Federal requirements. Five months have passed and the State has yet to take any action with regard to the Labadie and Sioux power plants.

\* \* \* \* \* \*

I have asked my staff to inspect the Union Electric Meremac [sic], Sioux, and Labadie plants within the next forty-five (45) days to verify and formally document their current status of compliance with all applicable emission limitations in the State plan. If these sources are found to be in violation, this office will be required to take appropriate action under Sections 113(a)(1) and 113(b) of the Act in the absence of any formal action by the Commission on the Union Electric variance petitions.

On January 13, 1978, the EPA notified Union Electric of its alleged violations of the $SO_2$ and opacity standards of the Missouri Implementation Plan. The EPA stated that Union Electric's Labadie and Sioux power plants were in violation of $SO_2$ and opacity regulations, and that the Meramec plant was in violation of opacity regulations.[3] The notice invited Union Electric to a conference to discuss the violations, and set forth the statutory responsibilities of the Agency if the matter was not resolved within thirty days.[4]

2. A variance shall be considered as a revision of the State Implementation Plan and approved as such by the EPA if, in addition to meeting procedural requirements, it will not prevent the maintenance of National Air Quality Standards. *Train v. Natural Resources Def. Council,* 421 U.S. 60, 95 S.Ct. 1470, 43 L.Ed.2d 731 (1975).

3. Prior to this date, the Meramec plant started using low sulfur coal which resulted in that plant being in compliance with the SO2 emission limitation.

4. This notice stated, in relevant part:

Section 113(b) of the Clean Air Act, as extensively revised by the recent 1977 Clean Air Act Amendments, now provides that whenever any person violates a requirement of an applicable implementation plan more than 30 days after having been notified of the violation, the Administrator shall, in the case of a major stationary source, and may, in the case of any other person, commence a civil action for a permanent or temporary injunction or to assess and recover a civil penalty of not more than $25,000 per day of violation, or both. A major stationary source is defined as any source which directly emits or has the potential to emit, one hundred tons per year or more of any air pollutant. The Administrator may also issue an order to

On February 3, 1978, the EPA held the conference with Union Electric. At this conference, the EPA indicated that it would commence enforcement proceedings without waiting for the decision of the Missouri Commission on the Company's request for variances for its plants. The EPA indicated that it was required to proceed with enforcement by § 111(b) of the Clean Air Act Amendments of 1977, 42 U.S.C. § 7413(b)(2)(B).

On February 8, 1978, Union Electric brought this action in federal District Court for the Eastern District of Missouri, seeking a declaratory judgment and temporary and permanent injunctive relief. It simultaneously sought action by the State of Missouri on its variance requests.

On March 16, 1978, the District Court granted the preliminary injunction requested by Union Electric 450 F.Supp. 805. The court found: (1) that Union Electric was in the unenviable position of having daily penalties for noncompliance with the Missouri Implementation Plan accrue while it sought variances pursuant to the statutorily authorized procedure contained in Mo.Ann.Stat. § 203.110 (Vernon); (2) that the failure of Union Electric to comply with any governmental directive could constitute an act of default under its first mortgage and deed of trust and make its bonds callable, and that a calling of the bonds could force it into bankruptcy; (3) that compliance with the $SO_2$ regulations is not possible because compliance can be achieved only by installing flue gas desulfurization (FGD) equipment at an initial cost of $713 million and annual operating costs of $137 million, that the FGD equipment could not be relied upon to operate continually or satisfactorily, that the use of low sulfur coal as an alternative was not possible because the annual cost of such coal would be $179 million per year and would require a capital investment of $49 million, resulting in a rate increase of twenty-five percent, assuming that there was no reduction in the use of electricity, and that, in any event, it was impossible to obtain a sufficient supply of low sulfur coal to meeting the $SO_2$ emission regulations; (4) that compliance with $SO_2$ regulations could be achieved only by a shutdown of the Union Electric plants which would result in a widespread electrical breakdown throughout the Midwest and drastic financial consequences to Union Electric; (5) that the injury to the EPA was not substantial because Union Electric's plants did not violate the National Air Quality Standards for $SO_2$; and (6) that Union Electric had a substantial likelihood of success on the merits because the Missouri Air Conservation Commission had informally indicated it would approve the variance.

The court concluded that: (1) considerations of procedural due process required that Union Electric be permitted to seek a variance under state procedures for $SO_2$ emissions [5] prior to suffering a grievous loss which may result from an enforcement proceeding by the EPA; (2) that it had the general equitable power to stay an enforcement proceeding to prevent irreparable harm while Union Electric seeks the variances, in good faith, under state procedures; and (3) that the only fair interpretation of the Clean Air Act is to allow the variance proceeding to proceed to completion prior to the initiation of an enforcement action. This appeal was filed on May 15, 1978.

On July 26, 1978, more than two months after this appeal was filed, the Missouri Air

require immediate compliance under Section 113(a) or an order specifying a delayed compliance date in accordance with specific requirements of Section 113(d) of the criminal penalties in certain cases.

In accordance with Section 113(a)(4) of the Act, we are offering you an opportunity for a conference to discuss the violations which are the subject of this Notice. The conference will afford Union Electric an opportunity to present information upon the findings of violation, on the nature of the violations, on any prior efforts made to achieve compliance or on steps the company has taken or will take to comply with the applicable regulations.

5. Union Electric concedes that the District Court did not enjoin the EPA from enforcing opacity regulations.

Conservation Commission granted the variance in the SO₂ standards requested by Union Electric for its Sioux and Labadie plants. A petition to review that variance was subsequently filed in the Circuit Court of Cole County, Missouri, by the Coalition for the Environment and by the State of Illinois. That action is still pending.

In *Lloyd A. Fry Roofing Co. v. United States E.P.A.*, 554 F.2d 885 (8th Cir. 1977), we held that pre-enforcement judicial review of an abatement order on grounds of technological or economic infeasibility is inconsistent with the enforcement mechanism established by Congress in the Clean Air Act. Senior Judge M. C. Matthes, writing for the Court, pointed out that a company seeking to have these issues reviewed could do so in state court, or could present its cause as a defense to any enforcement proceedings initiated by the EPA in federal district court. He also noted that if the Agency seeks retroactive civil penalties, a company can protect itself by invoking the equitable doctrine of laches if the Agency failed to promptly seek enforcement.[6] *Id.* at 891 & n.4.

Union Electric would have us distinguish *Fry* on the grounds that the plaintiff in *Fry* sought pre-enforcement review of an EPA compliance order while, here, it seeks only a temporary stay of any enforcement action which may be undertaken by the EPA pursuant to the notice of violation while a state variance from the emission limitations is sought.

Certainly this case cannot be distinguished from *Fry* on the grounds that *Fry* involved a compliance order and this case involves a notice of violation. If an abatement order may not be the subject of an anticipatory lawsuit enjoining its enforcement, then surely a notice of violation, which is a procedural prerequisite to an abatement order, may not be the subject of such a suit.[7]

Nor can it be distinguished from *Fry* on the grounds that *Fry* involved an attempt to obtain a pre-enforcement decision in Federal court on the merits of the Missouri Implementation Plan, while here, the attempt is only to secure a temporary stay of any further enforcement procedures while the Company is actively and in good faith pursuing a revision of the SO₂ emission regulations in state administrative agencies or courts. This distinction, of course, exists. However, it is not one which permits us to reach a result different than that which was reached in *Fry*. Section 7413(b) specifically requires the Administrator to commence a civil action for injunctive relief or for the assessment of civil or criminal penalties thirty days after notice of violation has been given to a major stationary source. One purpose of this section is to require the states to act promptly in granting or denying variance requests. This purpose would be thwarted if federal courts were permitted to remove the pressures that Congress clearly thought necessary to accomplish the objectives of the Clean Air Act. The heart of the decision in *Fry* is that federal courts should not interfere with the pre-enforcement procedures established by the Act to obtain compliance. *Fry* recognized that Congress intended the 1970 Amendments to the Clean Air Act to "expedite the implementation and enforcement of air quality

**6.** Civil or criminal penalties are not required by the Act. The Administrator may seek injunctive relief instead. 42 U.S.C. § 7413(b). If the Administrator seeks a civil penalty, the court is required to take into consideration "(in addition to other factors) the size of the business, the economic impact of the penalty on the business, and the seriousness of the violation." *Id.*

**7.** If a violation of the Act continues unabated for more than thirty days after issuance of a notice of violation, the Agency may either (1) immediately commence a civil action for injunctive or other relief; or (2) issue a compliance order, which is not effective until after an informal administrative conference. Under the second alternative, if the order issued by the Agency is not met within the specified time or informal efforts to abate prove unsatisfactory, the Agency is authorized to initiate an action in district court to compel compliance. 42 U.S.C. § 7413(a), (b).

standards" and that the Amendments were " 'a drastic remedy to what was perceived as a serious and otherwise uncheckable problem.' " *Id.* at 889, 891.

No case could better illustrate the need for expeditious enforcement than this one. The Missouri Implementation Plan was approved on May 31, 1972. Now, nearly seven years later, Union Electric is still not in compliance with the plan's $SO_2$ emissions limitations at its Labadie or Sioux plants, and the State of Missouri has yet to finally approve or disapprove its request for a variance from existing standards.

This statement of fact is not necessarily intended to point the finger at Union Electric, the State of Missouri or the EPA. All have been responsible in one way or another for the delays that have occurred. It is only to emphasize that we can only be faithful to the mandate of Congress if we require strict adherence to the procedural routes which it established for bringing clean air to the nation.

In *Fry*, we did not consider a contention by Union Electric which was deemed important by the District Court, *i. e.,* that Union Electric has a due process right to contest the validity of the emission standard without necessarily having to face ruinous penalties if it loses its action. The District Court relied on *Ex Parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), in so holding. In *Young,* the State of Minnesota enacted a number of statutes which established maximum rates which could be charged by railroads within the State and which fixed penalties for the railroads' failure to comply. Railroad officials contended that the statutes were invalid because the penalties imposed were so severe that no company official would run the risk of violating the statutes in order to test their validity. The Supreme Court sustained their contention. It stated:

> Another Federal question is the alleged unconstitutionality of these acts because of the enormous penalties denounced for their violation, which prevent the railway company, as alleged, or any of its servants or employees, from resorting to the courts for the purpose of determining the validity of such acts. The contention is urged by the complainants in the suit that the company is denied the equal protection of the laws and its property is liable to be taken without due process of law, because it is only allowed a hearing upon the claim of the unconstitutionality of the acts and orders in question, at the risk, if mistaken, of being subjected to such enormous penalties, resulting in the possible confiscation of its whole property, that rather than take such risks the company would obey the laws, although such obedience might also result in the end (though by a slower process) in such confiscation.

.    .    .    .    .

> [W]hen the penalties for disobedience are by fines so enormous and imprisonment so severe as to intimidate the company and its officers from resorting to the courts to test the validity of the legislation, the result is the same as if the law in terms prohibited the company from seeking judicial construction of laws which deeply affect its rights.

> Now, to impose upon a party interested the burden of obtaining a judicial decision of such a question (no prior hearing having ever been given) only upon the condition that, if unsuccessful, he must suffer imprisonment and pay fines, as provided in these acts, is, in effect, to close up all approaches to the courts, and thus prevent any hearing upon the question whether the rates as provided by the acts are not too low, and therefore invalid. The distinction is obvious between a case where the validity of the act depends upon the existence of a fact which can be determined only after investigation of a very complicated and technical character, and the ordinary case of statute upon a subject requiring no such investigation, and over which the jurisdiction of the legislature is complete in any event.

*Id.* at 144–145, 148, 28 S.Ct. at 447–449. *See also St. Regis Paper Co. v. United States,* 368 U.S. 208, 82 S.Ct. 289, 7 L.Ed.2d 240 (1961); *Oklahoma Operating Co. v. Love,* 252 U.S. 331, 40 S.Ct. 338, 64 L.Ed. 596 (1920); *Wadley S. R. Co. v. Georgia,* 235 U.S. 651, 35 S.Ct. 214, 59 L.Ed. 405 (1915).

We do not believe *Young* to be applicable here. Union Electric has an opportunity to test the validity of the Missouri Implementation Plan without *necessarily* incurring confiscatory fines and penalties. *See Brown & Williamson Tobacco Corp. v. Engman,* 527 F.2d 1115 (2d Cir. 1975), *cert. denied,* 426 U.S. 911, 96 S.Ct. 2237, 48 L.Ed.2d 837 (1976). The Administrator of the EPA, as we pointed out in note 6, *supra,* has two alternatives. He can either seek injunctive relief or can seek to impose civil or criminal penalties. We should not anticipate what the Administrator will seek in advance of his decision. Thus, it cannot be said that confiscatory fines and penalties will *necessarily* be incurred. Indeed, the Administrator apparently feels, in this case, that he has a third alternative—that of staying enforcement until the resolution of Union Electric's variance request.[8]

Union Electric makes a corollary argument that it must, at some point, have a forum in which to raise its contention that compliance with the Missouri Implementation Plan is economically and technologically infeasible, and that denial of such a forum results in its property being taken without due process of law. Without ruling on the merits of this issue, the Supreme Court stated in *Union Electric Co. v. EPA, supra,* that such a forum is available to alleged violators because contentions of economic and technological infeasibility can be raised in state court. *Union Electric Co. v. EPA, supra,* 427 U.S. at 266–267, 96 S.Ct. 2518. *See also West Penn Power Company v. Train,* 522 F.2d 302, 311–312 (3d Cir. 1975), *cert. denied,* 426 U.S. 947, 96 S.Ct. 3165, 49 L.Ed.2d 1183 (1976). Moreover, this Court held in *Fry* that such issues can be raised as a defense in an enforcement proceeding.[9] *Lloyd A. Fry Roofing Co. v. United States E.P.A., supra* at 891. The EPA conceded at oral argument that these issues can be raised in an enforcement proceeding. It affirmed that position in a post-argument memorandum which states:

Our position remains that, as was stated in *Union Electric v. Environmental Protection Agency,* 427 U.S. 246, 268 [96 S.Ct. 2518, 49 L.Ed.2d 474] (1976), "claims of technological or economic infeasibility * * * are relevant to fashioning an appropriate compliance order under § 113(a)(4)". And, of course, when a compliance order becomes the subject of an enforcement proceeding, then those same claims may be considered by the courts. Concededly, the Supreme Court, in footnote 18 of the *Union Electric* decision, *supra* at page 268 [96 S.Ct. 2518], expressly declined to address the question whether economic or technological infeasibility may be raised as a defense in civil or criminal enforcement proceedings. In our opinion, however, the correct rule must be that while such matters may not be raised in defense when the purpose of the defense is to contest the validity or constitutionality of an order, they may be raised as matters to be considered where

---

8. On September 13, 1978, the EPA notified Union Electric that it will not initiate any enforcement proceedings against that Company with respect to its alleged violations of the existing SO2 emission limitations until the Regional Administrator of the EPA has informed Union Electric, in writing, of its decision regarding a recommended approval or disapproval of the variance. The Company was further notified that if EPA's Regional Office recommended approval, the enforcement stay would be extended until such time as the Administrator of EPA has taken final action on the variance request. This notification would also appear to eliminate any risk that the Company's bonds would be called for failure to follow a governmental directive. We express no opinion as to whether this stay is authorized by the Act.

9. In *Union Electric Co. v. EPA, supra,* 427 U.S. at 268 n.18, 96 S.Ct. 2518, the Supreme Court declined to decide whether questions of economic and technological infeasibility can be raised in an enforcement proceeding.

the object of the proceeding is to fashion a schedule and plan which a company can comply with.

■ We cannot, of course, read more into *Fry* or into the EPA's concession than was intended. We do not now hold that the Clean Air Act will ultimately permit a non-complying polluter to continue operations without change if such change is not technologically or economically feasible. We do hold, however, that this question can be raised in any future enforcement proceeding, and that Union Electric at that time will be able to argue that Congress did not intend that result or that, if it was intended, the statute is unconstitutional.[10] We reserve our decision on that issue until it is properly presented to us.

We reaffirm our decision in *Lloyd A. Fry Roofing Co. v. United States E.P.A., supra,* and reverse the District Court. Any other course of action would be inconsistent with the enforcement mechanism which Congress has established in the Clean Air Act and would unreasonably delay achieving the objectives of that Act.

---

**10.** Mr. Justice Powell, concurring in *Union Electric Co. v. EPA, supra* at 271–272, 96 S.Ct. at 2532, stated:

    Environmental concerns, long neglected, merit high priority, and Congress properly has made protection of the public health its paramount consideration. * * * But the shutdown of an urban area's electrical service could have an even more serious impact on the health of the public than that created by a decline in ambient air quality. The result apparently required by this legislation in its present form could sacrifice the well-being of a large metropolitan area through the imposition of inflexible demands that may be technologically impossible to meet and indeed may no longer even be necessary to the attainment of the goal of clean air.

    I believe that Congress, if fully aware of this Draconian possibility, would strike a different balance.