**GILBANE BUILDING COMPANY, a Rhode Island corporation, Plaintiff,**

v.

**The NEMOURS FOUNDATION, a Florida corporation; Saxelbye, Powell, Roberts & Ponder, Inc., a Florida corporation; Furlow Associates, Inc., a Pennsylvania corporation, Defendants.**

Civ. A. No. 83–192.

United States District Court, D. Delaware.

Aug. 4, 1983.

William Prickett, Jr., and Richard R. Wier, Jr., of Prickett, Jones, Elliott, Kristol & Schnee, Wilmington, Del., John A. Wolf and John H. West, III, of Ober Grimes & Shriver, Baltimore, Md., of counsel, for plaintiff.

Stuart B. Young and Josy W. Ingersoll of Young, Conaway, Stargatt & Taylor, Wilmington, Del., George Anthony Smith and Thad D. King of Smith, Currie & Hancock, Atlanta, Ga., of counsel, for defendant The Nemours Foundation.

Frank O'Donnell of O'Donnell & Hughes, P.A., Wilmington, Del., Edward C. German and Peter E. Kane of German, Gallagher & Murtagh, Philadelphia, Pa., of counsel, for defendant Saxelbye, Powell, Roberts & Ponder, Inc.

Howard M. Berg of Howard M. Berg & Associates, P.A., Wilmington, Del., for defendant Furlow Associates, Inc.

## OPINION

LATCHUM, Chief Judge.

This diversity action involves a dispute between Gilbane Building Company ("Gilbane"), on the one hand, and The Nemours Foundation ("Nemours"), Saxelbye, Powell, Roberts & Ponder, Inc. ("Saxelbye"), and Furlow Associates, Inc. ("Furlow") on the other, relating to the construction of a new hospital building for the Alfred I. duPont Institute located near Wilmington, Delaware (the "Institute").[1] The plaintiff, Gilbane, has brought this action (the "Delaware action") against the defendants, Nemours, Saxelbye, and Furlow, seeking: (1) preliminary injunctive relief compelling the defendants to process work change orders and to issue updated contract drawings, (2) declaratory relief interpreting the rights and responsibilities of the parties under a construction contract, and (3) a judgment for damages against the defendants. (Docket Item ["D.I."] 1 & 2.) The defendants have moved to dismiss, or in the alternative to stay, this action on the grounds that such a dismissal or stay will promote the interest of federal-state comity and will avoid interference by a federal court with a state court proceeding. (D.I. 3.)

## I. BACKGROUND FACTS

The Institute is a non-profit hospital facility located near Wilmington, Delaware, established by Nemours under and by virtue of the Will of the late Alfred I. duPont. The hospital, which provides services for the care and treatment of crippled children, has operated since the 1940's. (D.I. 1 & 15, ¶¶ 6 & 7.). The present addition to the hospital is intended to increase the outpatient care capacity and to provide room for additional services. The architectural design includes, within the hospital building and grounds, a school (grades 1–12) to be attended by patients undergoing long-term rehabilitation therapy, recreational facilities, including a gymnasium, auditorium, olympic size swimming pool, handball courts and full facilities for special handicapped olympics. (D.I. 26 at 9.) The addition will also contain research facilities, physicians' offices, and other general hospital services.

The hospital is being built by phased construction. (D.I. 1 & 15, ¶ 11.) Different contractors have been engaged by Nemours for each phase of construction, and each

---

1. Jurisdiction exists by virtue of 28 U.S.C. § 1332. Gilbane is a corporation of the State of Rhode Island, with its principal place of business in Rhode Island. Nemours and Saxelbye are corporations of the State of Florida, with their principal place of business in Florida. Furlow is a corporation of the Commonwealth of Pennsylvania, with its principal place of business in Pennsylvania.

contractor is responsible only for a specific portion of the construction work. On January 21, 1980, Gilbane and Nemours entered into a contract (the "Contract") whereby Gilbane agreed to perform certain work as a contractor in connection with the construction of Phase 5B of the new hospital building. Phase 5B follows at least six other separate phases (phases 1, 2, 3, 4, 5 and 5EXT), which have been or are being performed by other contractors and involves the construction of certain interior portions of the hospital, such as interior services, walls, ceiling, finishes, together with certain procurement services. (D.I. 1, Ex. A, Art. 2.) Gilbane has subcontracted major contract work to Pierce Associates, Inc. ("Pierce") and Dynalectric Company ("Dynalectric") whereby Pierce is responsible for the mechanical, plumbing and fire protection facilities and Dynalectric is responsible for the electrical work. (D.I. 28 at 9.)

On February 28, 1983 Nemours filed suit in Equity Court in the Circuit Court for the Fourth Judicial Circuit in and for Duval County Florida against Gilbane, Pierce and Dynalectric (*see* D.I. 18, Ex. A) (the "Florida action"). In that action, Nemours seeks specific performance of the Contract with Gilbane, specific performance of Gilbane's contract with Pierce and Dynalectric, as well as damages for breach of contract and an accounting. *Id.* On April 5, 1983 Gilbane filed the instant action.

## II. DISMISSAL OR STAY OF PARALLEL ACTION

The defendants argue that all of the relief sought by Gilbane in this action can be obtained in the Florida action. The defendants thereby contend that, because of the existence of a prior parallel litigation which presents non-federal issues substantially identical to those presented here, this Court should exercise its discretion and dismiss or stay this case.

■ Federal district courts have the inherent discretionary power to dismiss or stay proceedings pending the disposition of a parallel proceeding in a state court. *See*

*Guenveur v. State Farm Mutual Automobile Insurance Co.,* 551 F.Supp. 1044, 1045 (D.Del.1982); *United States v. Cargill, Inc.,* 508 F.Supp. 734, 747 (D.Del.1981). This power is incidental to the power of every court to "control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants." *Landis v. North America,* 299 U.S. 248, 254, 57 S.Ct. 163, 166, 81 L.Ed. 153 (1936). The district court's discretion in this regard however, "is narrowly circumscribed, and in general only with the presence of exceptional circumstances will the existence of concurrent state proceedings warrant the abdication of the 'virtually unflagging obligation of the federal courts to exercise the jurisdiction given them'." *Cargill, supra,* 508 F.Supp. at 748, *quoting Colorado River Water Conservation District v. United States,* 424 U.S. 800, 817–18, 96 S.Ct. 1236, 1246–47, 47 L.Ed.2d 483 (1976).

■ The party seeking such a dismissal or stay has the burden of demonstrating that grounds exist to justify its grant. *Landis, supra,* 299 U.S. at 255, 57 S.Ct. at 166; *Guenveur, supra,* 551 F.Supp. at 1046; *Cargill, supra,* 508 F.Supp. at 748. The defendants, therefore, must "demonstrate either 'exceptional circumstances' or 'a clear case of hardship or inequity in being required to go forward' before" a dismissal or a stay may issue. *Guenveur, supra,* 551 F.Supp. at 1046, *quoting Landis, supra,* 299 U.S. at 255, 57 S.Ct. at 166.

No set formula exists for determining the existence of exceptional circumstances. Although there must be parallel proceedings, this alone is insufficient to warrant the grant of a stay or dismissal. *Cargill, supra,* 508 F.Supp. at 748–49.

Beyond this the Court must consider all relevant factors, engaging in a balancing process. In this process, however, the unflagging obligation to exercise jurisdiction is a factor to be given heavy weight:

No one factor is necessarily determinative; a carefully considered judgment taking into account both the obligation to exercise jurisdiction and the combi-

nation of factors counselling against that exercise is required.

> Colorado River Water Conservation Dist. v. United States, supra, 424 U.S. at 818–19, 96 S.Ct. 1246–47. Among the various factors that have been considered in other cases are the inconvenience of the federal forum, Colorado River Water Conservation Dist. v. United States, supra, the desirability of avoiding piecemeal litigation, id., the order in which jurisdiction was obtained by the concurrent forums, id., the existence of a federal policy militating either in favor or against such a stay, id., Union Electric Co. v. EPA, 593 F.2d 299, 304–305 (C.A.8), cert. denied, 444 U.S. 839, 100 S.Ct. 76, 62 L.Ed.2d 50 (1979), the identity of issues in the two forums or lack thereof, United States v. West Penn Power Co., 460 F.Supp. 1305 (W.D.Pa.1978), and the existence of an important countervailing federal interest which federal courts might be more likely than state courts to respect or enforce. Bio-Analytical Services, Inc. v. Edgewater, 565 F.2d 450 (C.A.7, 1977), cert. denied, 439 U.S. 820, 99 S.Ct. 84, 58 L.Ed.2d 111 (1978).

Id. at 749.

The Supreme Court in Moses H. Cone Memorial Hospital v. Mercury Construction Corp., —— U.S. ——, 103 S.Ct. 927, 937, 74 L.Ed.2d 765 (1983), has recently reiterated that "the decisions to dismiss a federal action because of parallel state-court litigation does not rest on a mechanical checklist, but on a careful balancing of the important factors as they apply in a given case, with the balance being heavily weighted in favor of the exercise of jurisdiction."

■ The actions in a state and federal court must be parallel. Guenveur, supra, 551 F.Supp. at 1046; Cargill, supra, 508 F.Supp. at 748. This criteria does not require that the actions be identical—the two actions may involve different parties. See Landis, supra, 299 U.S. at 255, 57 S.Ct. at 166. However, only in a rare case "will a litigant in one cause be compelled to stand aside while a litigant in another settles the rule of law that will define the rights of both." Id. As applied to the facts of this case, Gilbane is the plaintiff in this action and is one of the defendants in the Florida action and Nemours is one of the defendants here and is the plaintiff in the Florida action. The issues between Nemours and Gilbane in both this and the Florida action will require similar factual and legal determinations; for example, the issue of whether Nemours has the contractual right to inspect the books and records of Gilbane, Pierce and Dynalectric is present in both this and the Florida action. Although Saxelbye and Furlow are defendants in this action, but are not parties in the Florida action, and that Pierce and Dynalectric are defendants in the Florida action, but are not parties to this litigation,[2] these facts do not obviate the finding that the Delaware and Florida actions are parallel. See, e.g., Landis, supra, 299 U.S. at 255, 57 S.Ct. at 166. Having determined that the actions are parallel, this Court must now balance the factors articulated in Cone and Cargill and determine whether it should dismiss or stay this suit in favor of the Florida action.

### A. Inconvenience of the Delaware Forum.

■ In determining whether a federal forum is inconvenient to the parties, this Court must consider the relative ease of access to the sources of proof, the availability of compulsory process for attendance of unwilling witnesses, the possibility of viewing the premises, if viewing is appropriate, and the enforceability of a judgment if one is obtained. See, e.g., Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 508, 67 S.Ct. 839, 843, 91 L.Ed. 1055 (1947), cited with approval in Colorado River, supra, 424 U.S. at 818, 96 S.Ct. at 1246. "It is often said that the plaintiff may not, by choice of an inconvenient forum, 'vex,' 'harass' or 'oppress' the defendant by inflicting upon him expense

---

2. Pierce and Dynalectric, however, have filed companion cases against Gilbane in this Court. See Dynalectric Company v. Gilbane Building Company, C.A. No. 83–194 and Pierce Associates, Inc. v. Gilbane Building Company, C.A. No. 83–195.

or trouble not necessary to his own right to pursue his remedy. But unless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed." *Gulf Oil, supra,* 330 U.S. at 508, 67 S.Ct. at 843.

Turning to the facts of this case, the defendants argue that Florida is the logical and convenient forum because many of the records of Nemours and Saxelbye, both of which are Florida corporations, are maintained in Florida and that many of the potential witnesses are located in Florida. Further, the defendants assert that the Court should consider that Nemours filed the Florida action against Gilbane, Dynalectric and Pierce in Florida because Florida is the most convenient forum for Nemours. Although the defendants recognize that some witnesses located in Delaware may not be compelled to attend the proceedings in Florida, they argue that many witnesses who reside in Florida also may not be compelled to attend proceedings in Delaware, if the Delaware action continues. (D.I. 38 at 26.)

The fact that one forum may be a convenient forum to the defendants does not mandate a finding that another forum is inconvenient or illogical. The Court must also look to the contacts with this forum which is alleged to be inconvenient. In this case, Delaware has significant contacts with the disputes causing the impasse among the parties. First, Delaware is the situs of the negotiations of the Contract and the situs of construction of the hospital addition. Second, many of the construction records of Nemours, Gilbane, the subcontractors, and the suppliers are located in Delaware or nearby. Because of the proximity of most of the principle characters to the dispute, Delaware will provide many of the sources of proof and may allow compulsory process for some of the unwilling witnesses. Finally, it is important that this Court, unlike the Florida court, has jurisdiction over all of the parties.[3] This fact is highly significant because if a judgment is obtained by Gil-

bane this Court, unlike the Florida court, will be able to enforce the judgment against all of the parties to the dispute, including Furlow. Therefore, the Court finds that the defendants have not demonstrated that Delaware is an inconvenient forum for the parties sufficient to justify a dismissal or stay of this action.

### B. Desirability of Avoiding Piecemeal Litigation.

█ A second factor to consider whether to dismiss or stay this action in favor of the parallel Florida state-court action, is whether such a dismissal or stay will avoid piecemeal litigation. This entails an inquiry into the scope of the pending state-court proceeding and the nature of defenses open there. Such an inquiry should determine whether "the claims of all parties in interest can satisfactorily be adjudicated in that proceeding, whether necessary parties have been joined, whether such parties are amenable to process in that proceeding." *Brillhart v. Excess Insurance Co.,* 316 U.S. 491, 495, 62 S.Ct. 1173, 1176, 86 L.Ed. 1620 (1942), *cited with approval in Colorado River, supra,* 424 U.S. at 818, 96 S.Ct. at 1246.

The defendants contend that this and the Florida action involve the same contractual issues and that duplicative or piecemeal litigation will result if this action proceeds. Although the defendants recognize that Furlow is not a party to the Florida suit and is not subject to the jurisdiction of the Florida court, they argue that all relief which Gilbane seeks here can be obtained in the Florida action. They assert that Furlow has agreed to appear voluntarily and testify in Florida and has agreed to follow any directives given by the Florida court to Saxelbye which relate to the processing of change orders or to the updating of contract drawings. (*See* D.I. 34, ¶ 6.)

Furlow's promise, however, is not the equivalent to submission of jurisdiction in the Florida court. If the Florida court does not have jurisdiction over Furlow, it would be without power to enforce its orders

---

**3.** Florida does not have jurisdiction over Furlow, nor has Furlow indicated that it will sub-

mit itself to the jurisdiction of Florida. (*See* D.I. 34, ¶ 6.)

against Furlow. Furthermore, if Gilbane desires to obtain an enforceable judgment against Furlow, or desires to enforce Furlow's promise, it would be required to proceed in another court which would have jurisdiction. Therefore, the defendants have not demonstrated that all of Gilbane's claims could be adjudicated satisfactorily in the Florida action and that a dismissal or stay of this case would avoid piecemeal litigation.

### C. The Order In Which Jurisdiction Was Obtained.

The defendants argue that in deciding whether this Court should exercise its discretion to dismiss or stay this proceeding, the Court must consider the order in which jurisdiction was obtained over the parties. (D.I. 38 at 30.) The defendants claim that the Florida action has priority over this suit because the Florida action was filed, and the parties were served, more than four weeks before Gilbane filed this action.

The Supreme Court, however, in *Moses H. Cone Hospital v. Mercury Construction Corp., supra,* 103 S.Ct. at 940, stated that "priority should not be measured exclusively by which complaint was filed first, but rather in terms of how much progress has been made in the two actions." The Court finds, as in *Cone, supra,* that although the state-court suit action was first filed, the Florida state-court litigation has progressed very little from a substantive standpoint to the present time. In the Delaware action, by contrast, the parties have taken many steps toward the resolution of the contractual issues.[4] Therefore, the fact that the Florida action was filed four weeks prior to this suit is of little significance.

### D. The Existence of a Federal Policy Militating Either In Favor or Against the Dismissal or Stay.

*Cone* made clear that another factor to be considered whether to dismiss or stay a federal-court proceeding in favor of a state-court action is whether state or federal law will supply the rule of decision. For the purpose of this motion, the parties have assumed that Delaware law will control the issues in this case and that no important federal policies are at issue. (*See, e.g.,* D.I. 38 at 28.)

The defendants argue, however, that in the absence of an important countervailing federal interest, the balance whether to dismiss or stay the federal proceeding weighs in favor of the dismissal or stay. The Court disagrees with the defendants' argument because the state-versus-federal law factor, as with the other factors, is to be applied in a pragmatic, flexible manner with a view to the realities of the case at hand. The "task in cases such as this is not to find some substantial reason for the *exercise* of federal jurisdiction by the district court; rather, the task is to ascertain whether there exists 'exceptional circumstances' ... to justify the surrender of jurisdiction. *Cone, supra,* 103 S.Ct. at 942.

The state-versus-federal law factor has little significance in this case because if this Court were to dismiss or stay this action, the Florida court will probably apply Delaware law. This fact, however, does not give rise to the same federal policy consideration of allowing a state court to apply its own law, particularly when such law is unsettled and far-reaching. Perhaps if the parallel state-court action were in Delaware and the Delaware state court were applying Delaware law, then this factor would weigh in favor of the defendants. Therefore, the Court finds that the defendants have not demonstrated that any federal policy exists which justifies a dismissal or stay of this action.

In sum, after considering the factors enunciated in *Cone* and *Cargill,* the Court concludes that the defendants have not shown that exceptional circumstances exist or a clear case of hardship or inequity will

---

4. The defendants have not sufficiently demonstrated that the extensive discovery in the Delaware action, undertaken at Gilbane's insistence, was undertaken "simply in an effort to bootstrap its position that this Court should maintain jurisdiction over this suit and not stay these proceedings."

occur if this action is not dismissed or stayed in favor of the Florida action. Accordingly, the Court will deny the defendants' motion to dismiss or stay.

## III. GILBANE'S MOTION FOR PRELIMINARY INJUNCTION

■ Gilbane has applied for a preliminary injunction compelling Nemours, Saxelbye and Furlow to process work change orders and to issue full contract drawings. The Court of Appeals for the Third Circuit has consistently identified four factors which must be examined in ascertaining the propriety of injunctive relief:

> The moving party must generally show (1) a reasonable probability of eventual success in the litigation and (2) that the movant will be irreparably injured *pendente lite* if relief is not granted. Moreover, while the burden rests upon the moving party to make these two requisite showings, the district court "should take into account, when they are relevant, (3) the possibility of harm to other interested persons from the grant or denial of the injunction, and (4) the public interest." While these factors structure the inquiry, however, no one aspect will necessarily determine its outcome. Rather, proper judgment entails a "delicate balancing" of all elements.

*Eli Lilly and Co. v. Premo Pharmaceutical Laboratories, Inc.,* 630 F.2d 120, 136 (3d Cir.1980), cert. denied, 449 U.S. 1014, 101 S.Ct. 573, 66 L.Ed.2d 473 (1980), *quoting Constructors Association of Western Pennsylvania v. Kreps,* 573 F.2d 811, 814–15 (3d Cir.1978) (citation and footnotes omitted).

### A. *Probability of Success on the Merits.*

#### 1. *Work Change Orders*

Gilbane alleges that the defendants have wrongfully refused to process work change orders, that the continued refusal to process such change orders "seriously jeopardizes the project's completion and ultimate safety of the hospital" (D.I. 1, ¶ 35), and thus urges this Court to issue the preliminary injunction sought. (D.I. 1 at 20.)

Under the Contract, Gilbane is to receive a lump sum fee for general conditions, and personal fees, subject to modifications and adjustments of the contract price and extension of contract time of completion. (D.I. 1, Ex. A, Art. 6.) Modifications in the Contract are made pursuant to work change orders. A work change order is a written order to the contractor signed by the owner and/or the architect, issued after execution of the Contract, authorizing a change in the work or an adjustment in the contract sum or the contract time. The issuance of a work change order may be initiated by the owner, contractor, or subcontractors. (D.I. 1, Standard Contract 12.1.1.)

Also under the Contract, the cost or credit to Nemours resulting from a change in the work is to be determined in one of the following ways: (1) by mutual acceptance of a lump sum; (2) by unit prices stated in the contract documents or subsequently agreed upon by the parties; or (3) by cost to be determined in a manner agreed upon by the parties and a mutually acceptable fixed or percentage fee. The Contract also provides that if none of these three alternative methods resolve a dispute as to the cost or credit to Nemours resulting from a change in the work, then:

> the Contractor, provided he receives a written order signed by the Owner, shall promptly proceed with the Work involved. The cost of such Work shall then be determined by the Architect on the basis of the reasonable expenditures and savings of those performing the Work attributable to the change, including, in the case of an increase in the Contract Sum, a reasonable allowance for overhead and profit. In such case, . . . the Contractor shall keep and present, in such form as the Architect may prescribe, an itemized accounting together with appropriate supporting data for inclusion in a Change Order.

(D.I. 1, Ex. A, Art. 12.1.4.)

Nemours contends that it has utilized this fourth alternative provided by Article 12.1.4 for resolving disputes over a change order between itself and Gilbane. Nemours as-

serts that the majority of the outstanding work change orders that have not been processed encompass items of work where substantial controversies exist as to whether work is a change and/or what is the reasonable price for the change. Nemours has requested Gilbane, Pierce and Dynalectric to produce their accounting books and records in order to help resolve the remaining change estimates. Nemours claims that the books and records are required so that it can determine the reasonable expenditure and savings of those subcontractors performing the work attributable to the changes and thereby permit Nemours to process the change estimates. Gilbane's major subcontractors, Pierce and Dynalectric, however, have continuously refused to produce their books and records. Nemours contends that it cannot process the outstanding work change orders until it receives the necessary information from these Gilbane subcontractors.

Although Gilbane agrees with Nemours that Article 12.1.4 provides that Saxelbye will determine the cost caused by a change of work on the basis of the reasonable expenditures and savings based on an itemized accounting, Gilbane maintains that such a determination must be made prior to the commencement of the change of work. (D.I. 20 at 20; D.I. 20A at 1–68.) Gilbane also contends that Saxelbye has not determined the cost caused by a change of work prior to the commencement of the change and thus argues that Article 12.1.4 is not applicable. The Court disagrees with Gilbane's interpretation of Article 12.1.4 because that article expressly provides that Gilbane shall promptly proceed with the work with the understanding that the cost of the work will be determined at some subsequent date. Article 12.1.4, therefore, does not require Saxelbye to determine the costs prior to the commencement of the work. Gilbane's contention that Nemours has failed to implement the provisions of Article 12.1.4 because Saxelbye did not determine the costs of the work change prior to the commencement of the work therefore must fail.

Gilbane further maintains that Nemours has failed to comply with Article 12.1.4 because it has not issued written orders to Gilbane directing Gilbane to proceed with a change of work. Gilbane asserts that the express language of Article 12.1.4 requires Nemours to issue a written order to Gilbane prior to the time that Gilbane, or its subcontractors, initiates changes in the work. Gilbane, however, at this stage of the litigation, has not demonstrated that Nemours has failed to issue written work orders and whether such failure, if one exists, is a material breach of the provisions of Article 12.1.4.

Finally, Gilbane argues that Nemours and Saxelbye already have all of the necessary information to process the work change orders and that Nemours is using their request for books and records of Pierce and Dynalectric as a subterfuge in order to delay the processing of the work change orders. To support its argument, Gilbane notes that Nemours has processed approximately 10 million dollars in changes since the commencement of construction of Phase 5B and has processed changes in excess of $100,000 since the filing of the litigation without the benefit of the books and records of Pierce and Dynalectric. Nemours, however, argues that the books and records of Pierce and Dynalectric are necessary because they will reflect the actual costs of the completed work and thus are the best measure of the reasonable price to pay for that work.

The Court finds that Nemours and Saxelbye have processed well over 10 million dollars of change estimates since the commencement of the construction. This fact, however, does not mean that Nemours has no need to examine the books and records of Pierce and Dynalectric in order to process the more difficult change estimates. The Court also finds that the most reliable and efficient method for Nemours to determine the costs of the changes in the work is by inspecting the books and records of the subcontractors. Although there may be alternative methods to estimate the costs of the changes in the work, the Court notes that Gilbane, at oral argument, has taken

the position that Nemours is entitled to the books and records of Pierce and Dynalectric, but that Gilbane is unable to persuade or convince Pierce and Dynalectric to provide them to Nemours. (D.I. 45 at 46–47.) If, in fact, Nemours is entitled to examine the books and records of Pierce and Dynalectric, then Nemours should not be the party who should be penalized for the obstinacy of Gilbane's subcontractors. Therefore, the Court concludes, at this stage of the litigation, that Gilbane has not shown that Nemours' request for the books and records is a mere subterfuge, intended to delay the processing of the change estimates. Accordingly, Gilbane has not demonstrated a probability of success with respect to its claim that the defendants have breached their contractual obligation to process the change work orders.

### 2. *Updated Contract Drawings*

Gilbane next alleges that the defendants have refused to issue full-size updated drawings which include all approved modifications. These actions by the defendants, according to Gilbane, have caused coordination problems, increased Gilbane's work, and created confusion with the subcontractors and within Nemours' own staff in change negotiations and acceptance of work. (D.I. 1, ¶ 37.) Gilbane thus seeks a preliminary injunction compelling the defendants to issue full-size updated contract documents, and to continue to update the contract documents as construction of Phase 5B continues through completion. (D.I. 1 at 20.)

Under the contract, Gilbane is obligated to provide as-built drawings (D.I. 20A at A–66). As-built drawings are intended to show the deviations in the hospital's approved design made necessary by field conditions. The hospital has undergone design changes, and, accordingly, Nemours, Saxelby and Furlow have updated the drawings to reflect such changes.

Also under the Contract, Nemours, Saxelbye and Furlow are obligated to provide Gilbane updated contract drawings. (*Id.*) Gilbane has requested that the defendants provide full-sized updated contract draw-

ings capable of being reproduced for distribution to the subcontractors in order to show revisions to the architectural design. Gilbane claims that such reproducible, full-sized updated drawings are necessary to create a comprehensive, permanent record of the updated approved design and that such a permanent record assures that the owner, architect and engineers, contractor and subcontractors are all working from and on the same drawings. (D.I. 20A at A–66.)

Instead of producing the full-sized updated contract drawings, the defendants have provided Gilbane with A-sized drawings (8½ × 11 inches) which are copied directly off the revised full-sized drawings and are intended to be included in a binder containing all of the updated drawings. Gilbane alleges that this is not a proper method of showing updated designs and that without the full-sized drawings, the subcontractors and its field personnel do not know whether they are working from the same updated drawings. According to Gilbane, the issuance of the numerous A-sized drawings have resulted in a "hodge podge of cut and pasted inserts with handwritten notations" that are very confusing to the subcontractors and are further complicated when the defendants revise and delete prior A-sized drawings. Gilbane maintains that it is virtually impossible to assure that this cut and paste revision procedure properly reflects what has been changed on the updated full-sized drawings in the possession of the defendants (D.I. 20A at A–67–68), and argues that without the full-sized contract drawings, Gilbane will not be able to show field deviations of the revised design of the hospital addition and thus will be unable to produce as-built drawings.

Nemours argues that with the issuance of the A-sized drawings, Gilbane and the subcontractors have all of the updated drawings necessary to perform properly its obligations under the Contract, including the preparation of as-built drawings for Nemours. Nemours asserts that it does not want to distribute full-sized drawings because such distribution may create confu-

sion among the subcontractors causing some to perform work not assigned to them. Nemours thereby contends that the Court should not rewrite the Contract to comport with Gilbane's request simply because Gilbane believes that it would be more convenient to work with the full-sized contract drawings.

The Court finds that Gilbane has not demonstrated that the Contract requires the defendants to provide full-sized updated contract drawings to Gilbane or to the subcontractors. The Court also finds that Gilbane has failed to demonstrate that the distribution of the full-sized drawings will not cause some of Gilbane's subcontractors to perform work outside the scope of Gilbane's Contract. Finally, the Court finds that Gilbane has not demonstrated that it does not have in its possession a complete set of updated drawings. (*See* D.I. 41 at 146–48; D.I. 40 at 111.) Gilbane has only shown that it prefers to have the full-sized updated contract drawings. Therefore, the Court holds, at this stage of the litigation, that Gilbane has not demonstrated that the defendants have breached its contractual obligations when they have not provided Gilbane with full-sized updated contract drawings.

### B. *Immediate Irreparable Harm.*

An applicant for a preliminary injunction bears the burden of establishing that immediate irreparable injury will result if relief is not awarded. *Bancroft & Sons Co. v. Shelley Knitting Mills, Inc.,* 268 F.2d 569, 574 (3d Cir.1959). Gilbane has alleged that injunctive relief is needed so that the construction of the hospital will continue, pending a resolution of the existing controversy between Gilbane and the defendants. It further asserts that as a consequence of the defendants' refusal to process change estimates and issue full-sized updated drawings, the subcontractors and suppliers are left with no alternative but to suspend and withdraw from the project. The forced abandonment of the hospital project by the subcontractors, according to Gilbane, will work immediate and irreparable harm upon Gilbane and to the public because the abandoned hospital project constitutes a danger in its uncompleted state. (D.I. 20 at 33.) Specifically, Gilbane contends that it will be irreparably harmed because of its "incalculable exposure to claims and litigation as a result of the numerous health and safety hazards." (D.I. 35 at 1.)

Gilbane's argument that it may be subject to future lawsuits, which may result in monetary damages against Gilbane, does not satisfy the requirement that Gilbane demonstrate that it will suffer immediate irreparable harm. The Court of Appeals for the Third Circuit has stated that generally a showing of monetary damages alone will not be sufficient to warrant injunctive relief. *See A.O. Smith v. F.T.C.,* 530 F.2d 515, 527 (3d Cir.1976). Moreover, Gilbane has not shown that the alleged injury is imminent. Gilbane has not proved that the subcontractors will walk off the job if the Court does not grant injunctive relief. Nor has Gilbane demonstrated any area of the hospital where there is a probability that Gilbane and its subcontractors will not properly complete the job or where a future occupant is likely to be injured. Finally, even if the subcontractors do walk off the job, Gilbane has not demonstrated that substitute subcontractors will be unable to complete construction. Gilbane has demonstrated at most only that there is a possibility that Gilbane may be liable to future occupants of the hospital addition if the work is not performed in a proper manner by the present or future subcontractors. An injunction will not issue simply to eliminate a possibility of some remote future injury, or violation of rights. Accordingly, Gilbane has not bourne its burden of showing that immediate irreparable injury will result if the injunctive relief sought is not granted.

Having concluded that Gilbane has not shown a probability of success on the merits or that it will suffer immediate irreparable harm if the injunction is not issued, the Court need not take into account the two other factors sometimes considered on a motion for a preliminary injunction, that is,

harm to third parties by the grant or denial of the injunction and the public interest.

An Order will be entered in accordance with this Opinion.